UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION

KENNETH DESSAURE,

      Petitioner,

v.                                  Case No. 8:11-cv-500-T-30TBM

SECRETARY OF DEPARTMENT
OF CORRECTIONS,

      Respondent.

_____/

## ORDER

    Petitioner, a State of Florida inmate under sentence of death, seeks habeas corpus relief pursuant to 28 U.S.C. § 2254 and challenges the validity of his state conviction for first-degree murder.  Respondent argues that Petitioner neither states a federal constitutional claim nor meets the threshold requirements of 28 U.S.C. § 2254(d) and (e).

## PROCEDURAL BACKGROUND

    Petitioner was charged by an indictment with first-degree murder.  A jury convicted Petitioner and the state trial judge ultimately imposed a death sentence.  Petitioner appealed. (Dkt. #13, Ex. A41).  The Florida Supreme Court affirmed Petitioner's conviction and sentence.  (Dkt. #13, Ex. A44).  *See also Dessaure v. State*, 891 So. 2d 455 (Fla. 2004). Petitioner did not file a petition for writ of certiorari in the United States  Supreme Court.

    On February 28, 2006, Petitioner filed a state motion to vacate judgment of conviction and death sentence pursuant to Fla. R. Crim. P. 3.851.  (Dkt. #13, Ex. B1, pp. 1-69).  The

state post-conviction court denied the motion after an evidentiary hearing.  (Dkt. #13, Ex. B3, pp. 1-30).  Petitioner appealed the denial of his Rule 3.851 motion and simultaneously filed a state petition for a writ of habeas corpus in the Florida Supreme Court.  (Dkt. #13, Exs. B10, B13).  The Florida Supreme Court in a consolidated opinion both affirmed the denial of Petitioner's Rule 3.851 motion and denied his state habeas petition.  (Dkt. #13, Ex. B16).  *See also Dessaure v. State*, 55 So. 2d 478 (Fla. 2010).  Petitioner did not seek certiorari review in the United States Supreme Court.

Petitioner filed the instant Section 2254 petition on March 9, 2011.  Respondent does not challenge the petition's timeliness.  Petitioner presents four grounds for relief alleging ineffective assistance of both trial and appellate counsel.  Petitioner has exhausted his state court remedies rendering each ground subject to review on the merits.  Upon review, the petition is DENIED.

## FACTS[1]

Dessaure was charged by indictment with the February 9, 1999, first-degree murder of Cindy Riedweg.  Dessaure's trial began in the Circuit Court in and for Pinellas County on August 28, 2001.  On September 5, 2001, the jury found Dessaure guilty of first-degree murder.  FN1.  Dessaure waived his right to a penalty phase jury.  On October 26, 2001, the court sentenced Dessaure to death.  The evidence presented at trial established the following:

> FN1. The jury, utilizing a general verdict form, found Dessaure guilty of first-degree murder as charged.  It did not specify whether he was found guilty of premeditated first-degree murder, felony first-degree murder, or both.  However, the jury was instructed as to both premeditated murder and felony murder.

---

[1] This factual summary is taken from the Florida Supreme Court's order affirming Petitioner's conviction on direct appeal.  *Dessaure v. State*, 891 So.2d 455 (Fla. 2004).

*Guilt Phase*

Dessaure lived with Amy Cockrell and Tim Connole in apartment 1307 of the Villas at Countryside in Oldsmar, Florida.  Riedweg moved into apartment 1308 next door to them a couple of weeks before the murder.  Dessaure did not have a social relationship with Riedweg and had not been inside her apartment prior to the day of the murder.

On February 9, 1999, Cockrell left her apartment at 8 a.m.  Dessaure, Connole, and Connole's friend, Ivan Hup, were there when she left.  Connole and Hup went out for lunch around noon, leaving Dessaure alone in the apartment.

One of Riedweg's neighbors, John Hayes, left his apartment to go to work around 3:30 p.m. and encountered Dessaure in the parking lot.  Dessaure told him that he thought there was someone dead or dying in Riedweg's apartment.  When Hayes asked him how he knew that, Dessaure said he had gone to Riedweg's apartment for ice and looked in.  Hayes testified that Dessaure seemed nervous and his left hand was balled up.  Hayes did not want to become involved and told Dessaure to call 911.

. . . .

Paramedic Greg Newland, Captain Robert Carman, and EMT Jill Manines arrived at the scene at 3:39 p.m.  Dessaure met them and led them to Riedweg's apartment.  Newland testified that the back of Dessaure's shirt appeared to be wet.  Dessaure told them that he went to Riedweg's apartment to borrow some ice and found her on the floor.  Newland entered the living room of the apartment and found Riedweg lying on the floor in a pool of blood.  Riedweg was lying face down with her arms tucked under her body.  There were stab wounds to her upper back and shoulders.  Riedweg had no pulse and was not breathing, but her body was still warm.  Newland rolled Riedweg over and discovered that her throat had been slashed.  He pronounced her dead at 3:41 p.m.

. . . .

In March, the lease ran out on Cockrell and Connole's apartment and they moved.  They packed a knife set and later noticed that one of the knives from the set was missing.  They had bought the knife set prior to February 9, 1999, and it was in their apartment on the day of the murder.

Detective Thomas Klein and his partner, Detective Tim Pupke, arrived at Riedweg's apartment at 5:14 p.m.  They expanded the crime scene to include Dessaure's

apartment.  Klein entered Riedweg's apartment and saw blood stains on the carpet in the living room.  Once he reached the living room chair, he could see Riedweg's body lying in the hallway.  Klein found a scuff mark on the kitchen floor and a pool of water near the refrigerator and sink.

Dessaure took Klein and Craig Giovo of the Pinellas County Sheriff's Office Forensic Science Unit into his apartment to show them the knife with which he said he cut his hand while he was washing dishes.  Giovo saw blood stains on the threshold and at the bottom of the door of Dessaure's apartment and later took samples.  Dessaure showed them a knife lying on a dry sponge next to the kitchen sink.  The knife had blood smeared on it.  They opened the freezer door at 7:15 p.m. and saw blood stains on the bottom of the freezer and on the ice tray.  There was frost on the ice tray, and the ice cubes were frozen solid.  Giovo collected the ice tray and dumped the ice cubes in the sink.  Dessaure told the detectives that the ice cubes were not quite frozen earlier in the afternoon when he wanted ice, and that was the reason he went to Riedweg's apartment.  Klein asked Dessaure to accompany him to the Sheriff's Office to make a statement.  Dessaure's taped statement was played for the jury.

In his statement to police, Dessaure said that after his roommates left, he turned on the radio and started to clean at around 2 or 2:30 p.m.  He took the garbage out to the dumpster at around 2:45 p.m. and saw Riedweg sunbathing in a bikini with her eyes closed.  When he returned from the dumpster, he did not notice whether Riedweg was still outside because he looked down while he walked.  Dessaure put detergent and bleach in water in the sink and began washing a knife.  The knife slipped and cut the palm of his hand.  He put the knife down and ran water on the cut.

He finished drinking a cup of water and wanted another cup of cold water.  The ice cube tray was empty, so he filled it and put it and a cup in the freezer.  He went to Nathan Philips' apartment to get some ice, but Philips was not at home.  Dessaure went back into his apartment to get his cup; then, he went next door to Riedweg's apartment.  He knocked on the door and yelled for "Cindy."  He noticed that her stuff was still outside.  Her door was unlocked, so he opened it, called for her, and after receiving no answer entered the apartment.  He did not see anyone, so he walked to the edge of the kitchen.  He saw Riedweg lying on the floor with blood on her and left the apartment without touching anything.  Dessaure saw Hayes in the parking lot, told him he thought a lady was dead, and asked him for help.  Hayes told him to call the police and walked away.

Dessaure picked up Riedweg's phone, which was outside by her lawn chair, and called 911.  While he was on the phone with the sheriff's department operator, he went back inside his apartment to look for a cigarette but could not find one, so he picked up the

knife he had cut himself with earlier and began to clean it again.  While still on the phone with the sheriff's department, he cut himself again in the same exact spot that he cut himself earlier.  Dessaure said that every time he cuts himself it is always in that same spot.

. . . .

Dr. Laura Hair, an assistant medical examiner, performed an autopsy on Riedweg's body on February 10, 1999.  Hair found that Riedweg had suffered a total of fifty-three wounds, including three bruises, fifteen scrapes and pick marks, sixteen superficial cuts, fifteen deeper cuts, and four stab wounds.  There were five defensive wounds to the hands, three wounds that penetrated the trachea, three that damaged and collapsed the lungs, two that cut the exterior jugular vein, one that cut the liver, one that struck a vertebra, and one that cut a spinal nerve.  Hair testified that Riedweg could have remained conscious for four to six minutes after her lungs collapsed, and she could have survived from four to ten minutes.  Electrical activity could have continued for a few minutes more, perhaps ten to fifteen minutes.  Multiple stab wounds of the torso and neck were the cause of death.  Riedweg had not started her menstrual cycle and the rape kit came back negative.

. . . .

John Wierzbowski, a former Florida Department of Law Enforcement (FDLE) crime lab analyst, examined Dessaure's silver-gray T-shirt, a pair of black denim shorts, and a pair of flip-flop sandals to conduct a blood stain pattern analysis.  He found a transferred blood stain inside the right front pocket of the shorts, but he could not determine what object made the stain; it could have been any object covered with blood.  There were no stains of value for analysis on the sandals or shirt.

Tina Delaroche, an FDLE forensic serologist, examined Dessaure's black shorts and found six blood stains for analysis.  Several of the stains matched Riedweg's DNA profile.  Other stains may have come from Riedweg, but testing was not conclusive.  She examined Dessaure's shirt and found a faint blood stain on the front and a stronger blood stain on the back.  Her tests showed that the DNA profile from the stronger stain was consistent with Dessaure.  Blood stains on the knife from Dessaure's kitchen were also consistent with Dessaure.  She also examined a towel found in Riedweg's bathroom and a piece of fabric from Riedweg's bedroom comforter.  White stains on the towel and comforter tested positive for semen.  The DNA profile of the semen was consistent with Dessaure.  Swabs from Dessaure's apartment tested positive for blood, but none of them were consistent with Riedweg.

None of the tested blood samples from Riedweg's apartment were consistent with Dessaure.

Valdez Hardy, a former prison inmate who was in the same cell pod in the Pinellas County Jail as Dessaure, gave a sworn statement on November 4, 1999. Hardy testified that Dessaure told him he was concerned about a washrag that might have his semen on it. Dessaure said he came home one morning and saw Riedweg sunbathing in a lawn chair. He went upstairs, then came back down to take out the trash. He winked at her when he walked by and went back upstairs. When he came back down, she was gone. She had left her phone and a cup by her chair. He went to her door, found that it was open, and went inside. She saw him and "started tripping." Hardy thought that meant that she was screaming or getting nervous. Dessaure said the washrag was "the only thing that can really prove that." They already knew he was there because he called 911 and when he was leaving the apartment a guy saw him. He told the man that a girl was in there dead. The man told him to call the police. Dessaure said he went outside, picked up her phone, and called 911. Hardy asked if there was a lot of blood, and Dessaure answered, "yeah." A few days later he said that Riedweg was naked on the floor. Hardy said Dessaure told him the paramedics came first. He was outside smoking a cigarette, and he was nervous. The detectives questioned him and asked how he got the cut on his arm. He said he cut himself on a knife. They took him to his house, and he showed them the knife. Dessaure said that when he went to the police station, he asked the police why he would have called 911 if he had killed her. They told him he was facing the death penalty. When he got up to leave, one of the detectives grabbed him, slammed him against the wall, and arrested him. Dessaure said they took his roommate's shoes because he had changed shoes. He had been wearing flip-flops. He said something about a foot or a scuff mark in the kitchen. According to Hardy, Dessaure said that "can't nobody say he killed her. Don't nobody know what happened but him and her."

On cross-examination, Hardy denied that his conversation with Dessaure occurred on October 1, 1999, after a corrections officer left a newspaper with an article about Dessaure's case in the cell pod. He denied that he read the article, which stated that semen matching Dessaure's DNA profile was found on a towel in Riedweg's bathroom. The State had Hardy read the article in court and pointed out that there was nothing in it about Dessaure taking out the trash, scuff marks on the kitchen floor, leaving Riedweg naked on the floor, her having an immaculate house, a phone by her lawn chair, his roommate's shoes, paramedics arriving first, flip-flops, the detectives slamming him to the floor, seeing a guy as he was leaving, telling the guy she was dead, the guy telling him to call the police, and that he cut himself. Hardy also denied seeing or reading any police reports or depositions in Dessaure's case.

Shavar Sampson, another fellow inmate of Dessaure's, also testified that Dessaure told him about his case.   According to Sampson, Dessaure saw Riedweg outside sunbathing.   He wanted to talk to her, but she did not want to have a conversation with him.   The next day Dessaure went inside her apartment while she was outside sunbathing because he wanted to surprise her.   When she came inside, he tried to talk to her, but she did not want to talk.   She punched him.   He punched her back and knocked her unconscious.   He took off her two-piece bathing suit and began to have sex with her.   She regained consciousness and began fighting to get him off her.   Dessaure had a knife and stabbed her many times.   He removed his clothing and put on something he brought from home.   He called 911 to summon an ambulance.   Dessaure said his sperm went inside her while they were having sex.   Her period started, blood got on his underwear, and he had to change underwear.

. . . .

### Penalty Phase

Against the advice of his attorneys, Dessaure waived his right to a penalty phase jury.   The court questioned Dessaure to determine whether he understood that he had the right to have defense counsel present mitigating circumstances to the jury and to have the jury make a recommendation to the court.   Dessaure did not want defense counsel to present mitigating evidence to a jury.   He testified that he was acting against his attorneys' advice and that no one forced or advised him to make this choice.   He understood that his decision could not be revoked.

. . . .

Defense counsel proffered, by oral summary, the mitigating evidence he would have presented if Dessaure had not waived it, including the testimony of Dessaure's delinquency case manager and counselor, his mother, half-brother, older brother, half-sister, "surrogate mother," grandmother, Mary Parent, Amy Cockrell, and Dr. Maher, a psychiatrist.   Dessaure waived the testimony of each proposed witness.   Dessaure also waived the presentation of any legal argument by his counsel against the aggravating circumstances.   Defense counsel asserted that Dr. Maher found Dessaure competent to decide to waive mitigation and asked the court to consider Dessaure's demeanor throughout the proceedings as a mitigating circumstance.   The prosecutor proffered rebuttal evidence concerning the mitigating circumstances.

The court granted the prosecutor's request to order a presentence investigation.   At the *Spencer* hearing, the defense presented testimony from Dessaure's fiancee, Mary Parent, and Louise Randall, Dessaure's grandmother. [FN3].

FN3.  *Spencer v. State,* 615 So.2d 688 (Fla.1993).

The trial court found four aggravators:  (1) crime committed while previously convicted of a felony (conspiracy to commit armed robbery) and under sentence of imprisonment (community control); (2) prior conviction of a felony involving the use or threat of violence (resisting arrest with violence); (3) heinous, atrocious, and cruel (HAC); and (4) crime committed during the course of a burglary.  The court found no statutory mitigating circumstances and five non-statutory mitigating circumstances. FN4.

> FN4.  The non-statutory mitigators are:  (1) Dessaure was twenty-one years old (some weight); (2) Dessaure has the capacity and desire to be a loving parent (little weight); (3) Dessaure's family life was dysfunctional while he was growing up, his parents abandoned him to be raised by his grandmother, and his older brother died in a traffic accident (some weight); (4) Dessaure has the capacity to form personal relationships (little weight); and (5) Dessaure was well behaved in court (little weight).

*Dessaure v. State*, 891 So. 2d 455, 457-64 (Fla. 2004).

## **MERITS**

### **Standard of Review**

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"), governs this proceeding.  *Wilcox v. Florida Dep't of Corr.*, 158 F.3d 1209, 1210 (11th Cir. 1998), *cert. denied*, 531 U.S. 840 (2000).  Section 2254(d), which creates a highly deferential standard for federal court review of state court adjudications, states in pertinent part:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–

>> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or

(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

In *Williams v. Taylor*, 529 U.S. 362, 412-13 (2000), the Supreme Court interpreted this deferential standard:

In sum, § 2254(d)(1) places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court. Under § 2254(d)(1), the writ may issue only if one of the following two conditions is satisfied--the state-court adjudication resulted in a decision that (1) "was contrary to . . . clearly established Federal Law, as determined by the Supreme Court of the United States," or (2) "involved an unreasonable application of . . . clearly established Federal law, as determined by the Supreme Court of the United States." Under the "contrary to" clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by this Court on a question of law or if the state court decides a case differently than this Court has on a set of materially indistinguishable facts. Under the "unreasonable application" clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from this Court's decisions but unreasonably applies that principle to the facts of the prisoner's case.

"The focus . . . is on whether the state court's application of clearly established federal law is objectively unreasonable, . . . an unreasonable application is different from an incorrect one." *Bell v. Cone*, 535 U.S. at 694. *See Brown v. Head*, 272 F.3d 1308, 1313 (11th Cir. 2001) ("It is the objective reasonableness, not the correctness *per se*, of the state court decision that we are to decide."). The phrase "clearly established Federal law" encompasses only the holdings of the United States Supreme court "as of the time of the relevant state-court decision." *Williams v. Taylor*, 529 U.S. at 412.

The purpose of federal review is not to re-try the state case.  "The [AEDPA] modified a federal habeas court's role in reviewing state prisoner applications in order to prevent federal habeas 'retrials' and to ensure that state-court convictions are given effect to the extent possible under law."  *Bell v. Cone*, 535 U.S. 685, 693  (2002).  Federal courts must afford due deference to a state court's decision.  "AEDPA prevents defendants—and federal courts—from using federal habeas corpus review as a vehicle to second-guess the reasonable decisions of state courts."  *Renico v. Lett*, ____ U.S. ____, 130 S. Court. 1855, 1866 (2010).

Petitioner bears the burden of overcoming a state court factual determination by clear and convincing evidence.  "[A] determination of a factual issue made by a State court shall be presumed to be correct.  The applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  28 U.S.C. § 2254(e)(1).  This presumption of correctness applies to a finding of fact, but not to a mixed determination of law and fact. *Parker v. Head*, 244 F.3d 831, 836 (11th Cir.), *cert. denied*, 534 U.S. 1046 (2001).  The state court's rejection of Petitioner's post-conviction claims warrants deference in this action.

## Standard of Review for Ineffective Assistance of Counsel Claims

*Strickland v. Washington*, 466 U.S. 668 (1984), governs an ineffective assistance of counsel claim:

> The law regarding ineffective assistance of counsel claims is well settled and well documented.  In *Strickland v. Washington*, 466 U.S. 668, 104 S. Court. 2052, 80 L. Ed. 2d 674 (1984), the Supreme Court set forth a two-part test for analyzing ineffective assistance of counsel claims.  According to *Strickland*, first, the defendant must show that counsel's performance was deficient.  This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth

Amendment.  Second, the defendant must show that the deficient performance prejudiced the defense.  This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. *Strickland*, 466 U.S. at 687, 104 S. Court. 2052.

*Sims v. Singletary*, 155 F.3d 1297, 1305 (11th Cir. 1998).

*Strickland* requires proof of both deficient performance and consequent prejudice.

*Strickland*, 466 U.S. at 697 ("There is no reason for a court deciding an ineffective assistance claim . . . to address both components of the inquiry if the defendant makes an insufficient showing on one."); *Sims*, 155 F.3d at 1305 ("When applying *Strickland*, we are free to dispose of ineffectiveness claims on either of its two grounds.").  "[C]ounsel is strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment."  *Strickland*, 466 U.S. at 690.  "[A] court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct."  466 U.S. at 690.  *Strickland* requires that "in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance."  466 U.S. at 690.

Petitioner must demonstrate that counsel's error prejudiced the defense because "[a]n error by counsel, even if professionally unreasonable, does not warrant setting aside the judgment of a criminal proceeding if the error had no effect on the judgment."  466 U.S. at 691-92.  To meet this burden, Petitioner must show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A

reasonable probability is a probability sufficient to undermine confidence in the outcome." 466 U.S. at 694.

*Strickland* cautions that "strategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." 466 U.S. at 690-91. Petitioner cannot meet his burden merely by showing that the avenue chosen by counsel proved unsuccessful.

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial . . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992). *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious: the trial lawyers, in every case, could have done something more or something different. So, omissions are inevitable . . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (*en banc*) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)). *See also Jones v. Barnes*, 463 U.S. 745, 751 (1983) (counsel has no duty to raise a frivolous claim).

# I.   INEFFECTIVE ASSISTANCE OF TRIAL COUNSEL

**Ground One**

Petitioner contends that his trial counsel rendered ineffective assistance by allowing Petitioner to waive the penalty phase in front of the jury without first conducting a competency evaluation.  Counsel presented to the trial court during the penalty phase a Waiver of Right to Presentation of Mitigating Evidence Before the Jury[2] and a Waiver of Argument for Life Sentence.[3]  (Dkt. #13, Ex. A24, pp. 4310, 4313).  Petitioner argues that

---

[2]  The waiver states:

COMES NOW the Defendant, KENNETH LOUIS DESSAURE, and says:

    1.    I, KENNETH LOUIS DESSAURE, the Defendant herein, do hereby waive my right to present mitigation evidence to the jury in the penalty phase of my trial.  I am doing this against the advice of my attorneys.  I understand that I have the right to present mitigation evidence to the jury that would potentially lead to a life sentence.  My attorneys have explained to me what they reasonably believe to be the mitigation evidence but I would rather not present it to the jury.  My decision has been made freely and voluntarily.

    2.    I, KENNETH LOUIS DESSAURE, the Defendant herein, wish to retain my

counsel and understanding that society has a significant interest in determining whether a convicted murderer deserves to die, and to preserve the ability for a meaningful appellate review, I direct counsel to challenge the State's case and present mitigation on my behalf to the Court, in summary form, without calling witnesses.

UNDER PENALTY OF PERJURY, I declare the foregoing statements are true and correct.

(Dkt. #13, Ex. A24, p. 4310).

[3]  The waiver states:

The Defendant, KENNETH LOUIS DESSAURE, hereby waives argument by counsel in favor of a life sentence in this cause.  Further, I join the State in seeking a death sentence.

(continued...)

these two waivers constitute a "complete abandonment" by counsel and that counsel failed to request a competency evaluation by a mental health expert to determine whether Petitioner was competent to waive mitigation and join the State in seeking a death sentence.

The state post-conviction court rejected this ground[4] for relief in Petitioner's Rule 3.851 motion after an evidentiary hearing:

> Defendant claims he was denied effective assistance of counsel when he was allowed to waive a penalty-phase jury and to forfeit his right to contest a death sentence.
>
> Defendant presents three arguments to support his claim.  First, he asserts that if waiving the penalty phase jury was considered by Defendant before trial, counsel should have had a mental evaluation of Defendant during the pretrial stage of the case.  Second, he claims that if waiving a penalty phase jury was "the strategy all along by a competent defendant voluntarily relinquishing his right guided by willing counsel," then counsel was ineffective in seeking a death-qualified jury who allegedly would be more likely to convict.  Third, if waiving a penalty phase jury was a decision made only after the return of the guilty verdict, then Defendant should have been evaluated for competency before being allowed to waive the jury.  Defendant claims that counsel was ineffective for failing to have a "suicidal defendant" examined for competency.
>
> First, a pretrial mental evaluation of Defendant was conducted by Dr. Michael S. Maher, a psychiatrist, in February 2001 and in March 2001.  At the [R]ule 3.851 evidentiary hearing, Dr. Maher indicated that the February meeting was to evaluate Defendant's general condition, his competency, and any issues relevant to sentencing.  In a memorandum to his file,[5] Dr. Maher noted that there did not appear to be "strong support for mental health mitigation" and noted that there were some limited references to suicidal episodes in the past.  After his second meeting with Defendant, Dr. Maher made a diagnosis of "post-traumatic stress disorder based on childhood experiences of a chronic nature."

_____

[3](...continued)
UNDER PENALTY OF PERJURY, I declare that the foregoing statements are true and correct.

(Dkt. #13, Ex. A24, p. 4313).

[4] *See* Rule 3.851 motion, ground 4.  (Dkt. #13, Ex. B1).

[5] *See* Dkt. #13, Ex. B4, p. 13.

Assistant Public Defender Barry Cobb,[6] who initially represented Defendant, prepared a memorandum to his file dated March 27, 2001.[7]  In the memorandum, Attorney Cobb discussed Defendant's mental status and Dr. Maher's diagnosis. Attorney Cobb testified at the [R]ule 3.851 evidentiary hearing that during the two-year period in which he was representing Defendant, he arranged for him to be examined to determine his competency.  He did not recall anything about the results of the examination that would have led him to believe Defendant was not competent to stand trial and assist counsel.

Attorney Watts, who represented Defendant during the penalty phase of the trial, stated that he believed Defendant was competent to make the waivers of the penalty phase jury and the waiver of the presentation of mitigating evidence.  He consulted with Dr. Maher about Defendant's waivers and the doctor was in agreement.  Attorney Watts never had a concern about Defendant's competency.

Once a defendant is determined to be competent to stand trial, a presumption of competence attaches to the defendant in later proceedings.  *Boyd v. State*, 910 So. 2d 167, 188-89 (Fla. 2005).  On June 21, 2001, the Court granted Defendant's motion to appoint a psychologist/psychiatrist and appointed an expert for purposes of examining Defendant's competency at the time of the offense, competency at the time of trial, and "for any other matters which will be an aid for trial and sentencing."[8]  The record clearly indicates that Defendant was evaluated for competency before trial; therefore, counsel can not be deemed ineffective in this regard.

Second, waiving a penalty phase jury was not "the strategy all along by a competent defendant voluntarily relinquishing his right guided by willing counsel."  The Office of the Public Defender was appointed to represent Defendant on September 23, 1999. Attorney Cobb testified at the [R]ule 3.851 evidentiary hearing that during the time he represented Defendant, [Petitioner] would vacillate between wanting to participate in the preparation for the penalty phase of the trial and not wanting to participate.

Attorney Watts was appointed to represent Defendant on April 19, 2001, after the Office of the Public Defender was permitted to withdraw.  Attorney Watts testified that from the first time he met Defendant he expressed that he did not want a penalty

---

[6]  Assistant Public Defenders Barry Cobb and Jill Menadier initially represented Petitioner.  After the Public Defender's Officer withdrew from the case, attorneys Richard Watts, Michael Schwartzberg, and Dyril Flanagan were appointed to represent Petitioner.

[7]  *See* Dkt. #13, Ex. B4, pp. 19-22.

[8]  *See* Dkt. #13, Ex. B4, p. 37.

phase "in any way, shape or form."   However, Attorney Watts stated that in preparation for the trial commencing on August 21, 2001, he spoke with Defendant about his life and possible mitigating circumstances.  These conversations were in preparation for the penalty phase in the event Defendant changed his mind about proceeding with that phase.  Attorney Watts stated, "I've never had anybody that didn't go all the way through, and [I] wanted to be fully prepared."  He anticipated using Dr. Maher during the penalty phase of the trial and the doctor was prepared to testify.  Although during the time he was represented by Attorney Watts Defendant always had been adamant that he did not want to have a penalty phase, Attorney Watts always maintained hope that Defendant would change his mind and allow mitigation evidence to be presented.

Trial counsel was not ineffective in seeking a death-qualified jury because[,] under Attorney Cobb[,] Defendant had vacillated concerning whether he wanted a penalty phase trial and under Attorney Watts, counsel always held out hope that Defendant would change his mind and proceed with the penalty phase.

Third, the decision to waive a penalty phase jury was not made only after the return of the guilty verdict.   As discussed above, Attorney Cobb testified that Defendant vacillated about the decision whether to proceed with the penalty phase preparation.  Attorney Watts testified that from the first time he met with Defendant he had indicated that he did not want a penalty phase if he was found to be guilty.  Further, at trial, after the jury had returned its verdict, Attorney Schwartzberg informed the Court that Defendant had decided to waive the jury during the penalty phase of the trial.  He explained, "I will indicate to the Court this is not something that just was sprung on us.  I know there has been a considerable amount of thought on behalf of Mr. Dessaure in the event this happened, and despite the fact that the three of us have talked to Mr. Dessaure, this is his decision and we stand by it."

It was not necessary for a competency hearing to be conducted after Defendant entered the waiver because Defendant had been examined in March 2001 by Dr. Maher.  Further, Attorney Watts testified at the September 6, 2001, penalty hearing that he had spoken with Dr. Maher and the doctor had concluded that Defendant was competent to make the decisions regarding the punishment stage of the proceedings.  At the [R]ule 3.851 evidentiary hearing, Attorney Watts stated that in his opinion Defendant was capable of making the decision to enter the waiver and counsel never had a question about Defendant's competency.

Defendant was not denied effective assistance of counsel when he was allowed to waive a penalty phase jury.  This claim is denied.

(Dkt. #13, Ex. B3, pp. 14-17) (court's record citations omitted).

The Florida Supreme Court affirmed on appeal the state post-conviction court's denial

of this claim:

> Dessaure first claims that his trial counsel was ineffective for allowing Dessaure to waive his right to a jury in the penalty phase without ordering a competency hearing. Dessaure particularly relies on language contained in the forms he signed in waiving a penalty phase jury, namely that Dessaure joined the State in seeking the death penalty. Dessaure claims that this language is "extraordinary" and proves that he should have been given a second competency hearing. We disagree.
>
> Florida law provides that a defendant must be given a competency examination only if the court or defense counsel "has reasonable ground to believe that the defendant is not mentally competent to proceed." Fla. R. Crim. P. 3.210(b). Once a defendant has been deemed competent, the presumption of competence continues throughout all subsequent proceedings. *Boyd v. State,* 910 So. 2d 167, 187 (Fla. 2005) (citing *Durocher v. Singletary,* 623 So. 2d 482, 484 (Fla. 1993)). A subsequent competency hearing is only required "if a bona fide question as to the defendant's competency has been raised." *Id.* (citing *Hunter v. State,* 660 So. 2d 244, 248 (Fla. 1995)). If there is "no reason to suspect that a defendant is incompetent," then "it cannot be deficient performance if counsel does not request a competency examination." *Nixon v. State,* 932 So. 2d 1009, 1020 (Fla. 2006) ("[T]rial counsel had no reason to request a competency determination [because defendant] had been examined by a mental health expert who did not give trial counsel any reason to delve further into competency.").
>
> Here, defense counsel was not ineffective for not requesting an additional competency hearing for Dessaure. Prior to the beginning of trial, Dr. Maher evaluated Dessaure for competency and concluded that Dessaure was competent to stand trial and to make penalty phase decisions, even in light of his post-traumatic stress disorder and history of suicide attempts. In addition, three of Dessaure's defense attorneys, Messrs. Cobb, Schwartzberg,[9] and Watts, testified at an evidentiary hearing regarding their confidence in Dessaure's competency. Mr. Cobb testified that he could not recall anything about the results of that examination that suggested Dessaure was not competent to stand trial and assist counsel. Mr. Schwartzberg stated that he stood by Dessaure's decision to waive his right to a penalty phase jury because Dessaure gave a considerable amount of thought to the waiver and that all three talked to Dessaure

---

[9] This statement is factually inaccurate. Attorney Schwartzberg provided no testimony in the state post-conviction proceedings as he had passed away before the Rule 3.851 evidentiary hearing.

about it.  Mr. Watts testified that he consulted Dr. Maher about the penalty phase, and both believed Dessaure was competent to make waiver-type decisions.  Mr. Watts further testified that he spent roughly thirty hours with Dessaure discussing the case, Dessaure's background, and the penalty phase, and that Dessaure consistently maintained that he did not want a penalty phase.

The record also shows that the trial judge engaged in multiple colloquies with Dessaure to confirm that his waivers were knowing and voluntary, that Dessaure understood his right to present mitigation evidence, and that his decision not to present mitigation was against his attorneys' advice.  In sum, nothing in the trial proceedings raised a bona fide question about Dessaure's competency.

We also disagree that the language contained in the signed waiver was "extraordinary" or by itself draws Dessaure's competency into question.  The record makes clear that Dessaure's lawyers explained to him on multiple occasions that he should reconsider his decision to waive mitigation.  His attorney was prepared to present mitigation and also proffered the mitigating circumstances in court.  Dessaure had many opportunities to change his mind regarding mitigation.  Therefore, the waiver was nothing extraordinary, but rather a signed acknowledgment of the possible result of his actions.

Accordingly, defense counsel cannot be rendered ineffective for not requesting additional competency testing when Dessaure waived his right to present mitigation.

*Dessaure v. State*, 55 So. 3d 478, 482-83 (Fla. 2010).  The record supports the Florida Supreme Court's rejection of this ground of ineffective assistance.

### A.    Trial proceedings

On September 6, 2001, the day after the jury returned its guilty verdict,[10] Petitioner's counsel presented the trial judge with the Waiver of Right to Presentation of Mitigating Evidence Before the Jury.  Counsel advised the court that Petitioner, after considerable

---

[10]  The jury announced that it had reached a verdict at 11:16 p.m. on September 5, 2001.  The trial judge granted defense counsels' request to speak with Petitioner about the penalty phase that evening and set a status hearing for the following morning.  (Dkt. #13, Ex. A37, pp. 1819-20).

thought, wished to present the waiver despite counsels' advice.  (Dkt. #13, Ex. A37, pp. 1827-28).  The trial judge inquired of Petitioner:

| | |
|---|---|
| Court: | I have had a chance to read the Waiver of Right to Presentation of Mitigating Evidence Before the Jury.  It appears to have your signature on it.  This is your signature? |
| Defendant: | Yes, sir. |
| Court: | And it does state in here that you are making this decision against the advice of your attorneys; is that correct? |
| Defendant: | Yes, sir. |
| Court: | And this is your decision? |
| Defendant: | Yes, it is. |
| Court: | Nobody has forced you to do this? |
| Defendant: | Nobody has forced me, no. |
| Court: | You understand, sir, that this decision is going to be irrevocable.  You can't later on change your mind. |
| Defendant: | I understand that. |
| Court: | And the reason that I'm saying that is that, you know, on the record I'm going to be, you know, directing the clerk to call off the jury and we are going to do that today.  And once they are called off, then they are totally released from any obligation or admonition that I gave them about reading anything about this case, about talking to anybody about the case, and so it would then be, you know, difficult, if not impossible, to undo that once they are told they are released.  You understand that? |
| Defendant: | I understand that. |
| Court: | Okay.  And just as long as you understand that this is a decision that you are making now and you can't later say, oops, changed my mind, you can't say that.  Do you understand that? |

| | |
|---|---|
| Defendant: | I understand that. |
| Court: | And even knowing that, you are standing by the decision that you have made? |
| Defendant: | Yes, sir. |
| Court: | Okay.  That's fine. |
| . . . . | |
| Court: | . . . . I'll, at this point, find that [Petitioner], against the advice of his attorneys, has waived his right to present mitigating evidence and testimony to a jury and to present mitigation only to the court.  And I will file his waiver with the clerk at this time. |

(Dkt. #13, Ex. A37, pp. 1829-32).

During the penalty phase on September 11, 2001, counsel filed Petitioner's Waiver of

Argument for Life Sentence.  The trial judge inquired of defense counsel:

| | |
|---|---|
| Court: | All right.  I'm unsure, Mr. Schwartzberg, at this point, and Mr. Watts, exactly what [Petitioner] now is waiving.  I know that you had said last week, and one of the things, I guess, I read in the paper, was that you weren't going to be calling any witnesses, that you were going to put forth summaries of some kind.  I guess the problem I have is are those the types of documents that I could consider in mitigation, or is it more in the line of a proffer that I couldn't consider in mitigation or don't have to consider in mitigation.  That is what I'm wanting to make sure everyone is clear on. |
| Watts: | Judge, its' more the nature of a proffer.  They won't be at the height of an evidentiary level.  It's to let Your Honor know what mitigation we found, to let other courts know, or anybody else who would like to know what mitigation is there, understanding that we are not presenting any evidence whatsoever. |
| Court: | I understand.  And the reason I ask this is that I just had a case that I was personally involved with on another murder one issue where the defendant after the trial phase waived the right to present any evidence |

and testimony and, in fact, he waived his right to even have an attorney so I let him represent himself with the PD on standby. And he said, I don't want anybody called, I don't want to put forth any argument. So I called the Public Defender in that case and had them proffer everything, who they were going to call, what they were going to say, and then after each proffer, I asked the defendant to acknowledge, yes, I understand that's what they were going to say but I don't want them to testify. And the Supreme Court said - - and then I didn't consider any of the proffer, proffered testimony in my sentencing order and the Supreme Court said that that was perfectly acceptable, that I didn't have to because it wasn't evidence, it was just a proffer. So, you know, as long as we all understand, we, meaning Mr. Dessaure, particularly, understands that you might be telling me this stuff, but it's not rising to the level of something that you have to show by clear and convincing or something less, maybe, of evidence that that mitigated circumstance exists or doesn't exist. So I can certainly take judicial notice of other things even if you present nothing that has happened in this case from the time of his arrest through this instance in the court file or not anything that happened during the trial even and put that in the form of, you know, a mitigating circumstance to go through the weighing process. In the other case I was involved with, I did that and the Supreme Court again said that that was, you know, the appropriate way to handle it. . . . Mr. Dessaure, I do need to ask you some questions. You can remain seated. Raise your right hand to be sworn.

. . . .

Court:        Okay. I want to go back through, Mr. Dessaure, real quick what we did last week just to, again, get it on the record again under oath that this is what you want to do.

              You understand, Mr. Dessaure, that you have a right to have your attorneys present mitigating circumstances to a jury and have that jury make a recommendation to me. Do you understand you have that right?

Defendant:    Yes, I do, sir.

Court:        And in line with what happened last week, is it still your desire not to have your attorneys present any testimony or evidence to a jury for their recommendation? Is that still your desire?

Defendant:     Yes, sir.

Court:     Anybody forcing you to do this?

Defendant:     No, sir.

Court:     And I understand, from what I heard last week, is that you are doing this against your attorneys' advice?

Defendant:     Yes, I am.

Court:     Is there anybody else advising you that this is what you need to do?

Defendant:     No, sir.

Court:     This is your decision and your decision alone, and you understand, as I asked you about last week, that it is irrevocable and you can't come back and say, oh, I changed my mind down the road.  You can't say that?

Defendant:     I understand that.

Court:     All right.  Now, with regard to the document that you just signed that's presented to me today, you understand that by your signing this document that you are telling us that you do not want your attorneys to present any evidence or testimony to substantiate any mitigating circumstance that might exist?  Is that what you are telling me?

Defendant:     Yes, sir.

Court:     And, again, you are doing this against your attorneys' advice?

Defendant;     Yes, sir.

Court:     They are not telling you that this is what you need to do?  They are saying, no, you don't need to do this, but you are doing it anyway?  Is that what you are telling me?

Defendant:     Yes, sir.

Court:     Anybody forcing you to do this?

Defendant:   No, sir.

Court:   This is your decision and your decision alone?

Defendant:   Yes, sir.

Court:   Okay. So by this, Mr. Watts, I'm assuming that, then, the defense will not be calling any witnesses to try to substantiate any mitigating circumstances; is that right?

Watts:   Correct, Your Honor.

Court:   Now, I understand that you were going to try to talk with Dr. Maher yesterday. Did that happen?

[Watts]:   Yes, sir.

Court:   Okay. But he still hasn't prepared a report of any kind for me to look at or that you wish to submit to me?

Watts:   Correct.

Court:   Prior to - - Mr. Watts, prior to Mr. Dessaure making this decision, had you discussed with him what mitigating circumstances you feel might exist that might be in has favor?

Watts:   With Mr. Dessaure, yes, Your Honor.

Court:   And I'm wondering if we need to get a proffer of what witnesses you might be calling or could have called to establish these mitigating circumstances, and at least give Mr. Dessaure an opportunity to say, yes, I understand that's what they would testify to if they were called, but I don't want them called.

Schwartzberg:   Yes, Your Honor.

Court:   Is that the way you were planning on doing this, Mr. Watts?

Watts:   The way we planned, Judge, was to make presentation to Your Honor orally of the mitigation and how we would prove it to the Court in summary form.

Page 23 of  72

| | |
|---|---|
| Court: | Okay. I understand. Then I'll give Mr. Dessaure an opportunity to say, yes, I understand that's what it is, but I don't want any witnesses called. Is that where we are? |
| Watts: | Yes, Judge. |

(Dkt. #13, Ex. A38, pp. 1844-49).

Following the prosecution's presentation on the applicable sentencing factors, defense

counsel presented a proffer of mitigation:

| | |
|---|---|
| Watts: | Judge, at this time we present a proffer of mitigation. Mr. Flanagan will proffer some. I'll proffer the rest. |
| Court: | That's fine. |
| Watts: | Typically, at this point, Judge, I would address the aggravating circumstances, but I've been asked not to argue and I'm going to abide by my client's wishes. |
| Court: | So at this point, based on what Mr. Dessaure has directed to you, that you will not in any way present any type of argument as it relates to any of the four mitigators that the State has indicated that the evidence has shown. Is that your position? |
| Watts: | It's my understanding that my client wishes I not argue those. There are arguments that the defense could make to each. I'm not going to address those at his request. |
| Court: | I understand. Mr. Dessaure, do you understand what we are just saying here, that ordinarily it would be the defense's position that they would present either evidence or testimony to try to rebut some of these aggravating circumstances but because of the position that you have taken, you have directed your attorneys not to present that argument; is that correct? |
| Defendant: | Yes, sir. |
| Court: | That's fine. Continue. |

[Prosecutor]:  Judge, just so it's clear on the record, that includes the legal argument as it relates to those, not only evidentiary arguments but also legal argument as well?  I want it clear on the record that the defense is waiving that as well.

Court:  Mr. Watts?

Watts:  Correct, Judge, we waive.

Court:  Mr. Flanagan?

Flanagan:  Basically, Judge, what I plan to do here is summarize specifically a counselor, family members, four or five family members, and [a] friend of the family.  Judge, within that group, and I don't know how the Court wants to break these down - -

Court:  Let's do it one at a time . . . and the reason is, I want to do it as what this person would say if you called him, and give Mr. Dessaure an opportunity to say, yes, I understand that's what they would say but I don't want you to call them.

And it will be the same two questions each time, Mr. Dessaure, just so you know.  I want the record to be clear that you know what they are going to say but you don't want me to hear other than what Mr. Flanagan is telling me.  All right?

Defendant:  Yes.

(Dkt. #13, Ex. A38, pp. 1886-88).   Thereafter counsel proffered the testimony of a delinquency case manager (Leonard Stuart), Petitioner's mother, (Barbara Dessaure), Petitioner's younger half-brother (Frankie Lipscom), Petitioner's older brother (Freddie Dessaure), Petitioner's younger half-sister (Toshiba Dessaure), a woman whom Petitioner considered a "surrogate" mother (Victoria Folley), Petitioner's grandmother (Louise Randall), the mother of one of Petitioner's children (Mary Parent), a friend (Amy Cockrell), and a psychiatrist (Dr. Michael Maher).  (Dkt. #13, Ex. A38, pp. 1888-1905).  The trial judge

inquired of Petitioner at the conclusion of the proffer of each individual witness whether he understood that the judge would not consider the proffered testimony in determining a sentence and whether Petitioner desired that each witness's testimony not be presented to the court.  Petitioner confirmed that he wanted none of the witnesses to testify.  (Dkt. #13, Ex. A38, pp. 1891, 1895, 1897, 1899, 1900-03, 1905).

Later during the penalty phase the trial judge inquired of Petitioner and counsel about the waiver of legal argument.  Petitioner confirmed that he did not want counsel to present any legal argument against the aggravating circumstances argued by the prosecution.[11]

---

[11]  The trial judge inquired:

| Court: | Mr. Dessaure - - thank you, sir.  Mr. Dessaure, the rules that concern imposition of sentence in a situation like this are sometimes difficult for all of us to understand that work with them.  And so I'm sure for someone, you know, who is not familiar with them, such as yourself and most everybody else in this courtroom, the need for some of these questions, I'm sure seems to, you know, be questioned as to why is he asking that, why do we need to get this on the record.  And, believe me, if I didn't have to be asking you these questions, I wouldn't.  Your lawyers, I'm sure, would second that, but they know the reasons for this. |
|---|---|
| | The State has the burden, Mr. Dessaure, of proving the aggravating circumstances beyond a reasonable doubt, just like they had the burden during the trial phase earlier to prove - - to remove the mantle of innocence around you and prove that beyond a reasonable doubt.  Your lawyers and the defense, on the other hand, does not have to prove these mitigating circumstances, but just show that they exist, don't have to prove them.  The State has a bigger burden in this phase of the trial, certainly, and a much heavier burden than your lawyers do.  And that's why after the State gets done, the attorneys for the defendant are given an opportunity to propose and make legal arguments to show why these aggravating circumstances don't exist.  Mr. Watts has indicated that you do not want them the present any legal argument against aggravating circumstances.  Is that your position and opinion? |
| Defendant: | Yes, sir. |

(Dkt. #13, Ex. A38, pp. 1905-06).

Page 26 of  72

Counsel advised the court that Dr. Maher opined that Petitioner was competent to make this decision.[12]  (Dkt. #13, Ex. A38, pp. 1903-04).

## B.     Post-conviction proceedings

Petitioner's post-conviction counsel called several experts and Petitioner's trial counsel to testify at the Rule 3.851 evidentiary hearing.

### 1.     Dr. Henry Dee

Dr. Henry Dee, a clinical neuropsychologist, testified that he met with Petitioner on three occasions between December 2005[13] and March 2007.  Dr. Dee testified to Petitioner's background and previous suicide attempts and opined that Petitioner suffers from both depression and paranoid personality disorder.  (Dkt. #13, Ex. B7, pp. 15-16, 19).  Dr. Dee testified, based on his experience in death penalty cases, that a competency evaluation was warranted when Petitioner decided to join the State in seeking a death sentence because "joining a motion for a death penalty is obviously suicidal and that would be one of the things that ought to trigger a competency evaluation.  (Dkt. #13, Ex. B7, p. 26).

---

[12]  After the prosecutor's comments on the defense's proffer, counsel advised the court:

Watts:   Two comments, Judge[.]  Dr. Maher, we advised him of the defendant's position [about waiving his right to a penalty phase jury and legal argument for a life sentence] and the defendant's position was sort of obvious to him in the lack of cooperation, but I did ask Dr. Maher if he felt that Mr. Dessaure was competent to make the decision that he was making and he found him to be so.

(Dkt. #13, Ex. A38, p. 1912).

[13]  Dr. Dee first met with Petitioner over four years after Petitioner's conviction.

On cross-examination, Dr. Dee testified that his neuropsychological testing of Petitioner showed that Petitioner tested within normal limits and was of average intelligence. Dr. Dee discussed the waivers with Petitioner and Petitioner admitted that his attorneys advised him not to execute the waivers but he chose to do so against his attorneys' advice. (Dkt. #13, Ex. B7, pp. 33-34).   Competency was not a concern for Dr. Dee during his meetings with Petitioner.   (Dkt. #13, Ex, B7, pp. 36, 40).   However, he testified that he believed Petitioner would have qualified for involuntary commitment under the Baker Act at the time Petitioner signed the waiver joining the State in seeking a death sentence.   (Dkt. #13, Ex. B7, pp. 45-46).

### 2.   **Dr. Michael Maher**

Dr. Michael Maher testified on direct examination at the Rule 3.851 evidentiary hearing about his pre-trial assessment of Petitioner's competency and Petitioner's understanding of the penalty phase:

Q:   Okay.  Do you have your file with you, sir?

A:   I do.  I have a note from Barry Cobb, the assistant public defender, April 18, 2001, and it may be that that indeed was the first contact.

. . . .

Q:   Okay.  And does the letter state what you had been tasked to do, or does it refresh your recollection about what you had been tasked to do vis-a-vis Mr. Dessaure?

A:   It does.

Q:   Okay.  And what was that sir?

A:     I was informed that they had a client who was charged with murder and that it was likely to proceed as a death case.  They wanted me to evaluate him for general medical and psychiatric purposes, which I understood to mean and include competency as well as issues that may relate to the offense itself.  In this case, insanity was not one that was at issue or raised, but issues related to mitigation and [the] sentencing proceeding were considered.

Q:     Okay.  So the aspect of an evaluation to undercover [sic] what would be mitigating circumstances that could be presented to the jury and the court was your primary focus on Mr. Dessaure's case?

A:     Yes, that's correct.

Q:     Does your record reflect on what occasions you actually saw Mr. Dessaure?

A:     I saw him February 20, 2001, and then I saw him again in March - - I don't have the exact date - - 2001 also.

Q:     Okay.  And are those the only two days that your notes or records reflect that you actually physically visited with Mr. Dessaure?

A:     Yes, that's correct.

. . . .

Q:     Okay.  What was the purpose of the February 20, 2001, visit with Mr. Dessaure, and what, if any, conclusions did you draw after meeting with him?

A:     The purpose of that was to - - for the defense team to introduce me to him, for me to have an opportunity to evaluate in an initial manner his general condition, his competency, and to identify, if it was possible on that occasion, issues that might be relevant to sentencing, and indeed it was possible to accomplish those tasks on that occasion.

. . . .

Q:     All right.  And at that time it says here in this memo to file[14] that you left a message for Barry Cobb, indicated I wanted to talk to him about my first

---

[14]  *See* Dkt. #13, Ex. B5, p. 90.

impressions.  It goes on to say basically the client is not interested in actively helping to prepare a second phase.

It says [there] does not appear to be strong support for mental health mitigation, although the defendant certainly at this point, hiding anything that might be present, there was some limited references to suicidal episodes in the past.  I hope to speak to the attorney first and talk to family members to try to develop some background information.  Certainly there does appear a history and background consistent with a chaotic and abusive upbringing, which would be relevant, and then it says, I'll need to talk to Nicky, his sister.

Are you the author of that memo?

A:     Yes.

. . . .

Q:     Okay.  All right.  So - - so that part of the memo where it says "does not appear to be a strong support for mental health mitigation," at a later time you did formulate a diagnosis which supported some mental health mitigation, did you not?

A:     Yes, I did.

. . . .

Q:     Okay.  You received some documents from either Mr. Schwartzberg or Mr. Watts?

A:     That's correct.

. . . .

A:     . . . [T]here just wasn't a lot of communication between myself and the defense counsel in this case.  There was minimal.

Q:     And do you mean from the point in time that Mr. Schwartzberg and Mr. Watts got on the case, or are you talking about from the beginning of your involvement?

A:     Really from the beginning of the involvement.  I did speak with Mr. Cobb and I think Rita Bruno from the Public Defender's Officer directly about the case early on.  But after my initial two contacts and apparently the continuing clear statement from Mr. Dessaure that he didn't care to be evaluated, I just didn't have a lot of involvement in the case.

       I recall asking whether I should close the case or keep it open and be ready to do something, and I recall being told I should keep it open and be ready to do something and they'd let me know when there was a need or opportunity.

Q:     Okay.  When you talk about Mr. Dessaure's lack of interest in a penalty phase proceeding - - or is that what you're saying, he had a lack of interest when you talked to him?

A:     Yes.

Q:     Is that unusual in death penalty litigation that that occurs?

A:     I would say it's not typical.  Most people who are facing a death penalty are willing to talk about issues that might be related to death penalty mitigation, their background, their history, their family history and so on.  On the other hand, it certainly isn't highly unusual in my experience.  Maybe ten percent of people really seem to understand that they are seriously facing a death penalty, but regardless of that simply don't want to talk about things that might be of a personal nature and might be mitigating, whether they are mental health factors or other factors of a personal nature.

Q:     And did you formulate any opinion as to why Mr. Dessaure wasn't as cooperative or forthcoming as you would have liked?

A:     Yes.

Q:     What is that opinion?

A:     Two issues:  One that he said directly - - and I believe this was part of his motivation - - that he wanted his defense counsel to focus on his - - the guilt phase of his trial.  And he understood their statements that they would focus on both parts, but he wanted to make it clear that he was interested in their doing everything they could on that part and not that interested in the other part.

Page 31 of  72

He also made it clear to me, and it was further reinforced by my review of his records, that it was emotionally very difficult and unpleasant for him to talk about his background, his family history, the issues which had affected him and which he had grown up with, where he had lived, who he had been with, who had supervised him, what his relationship with his family members were, things of that sort.

So that just as combat war veterans often will not want to talk about the reasons that they have PTSD, their war experiences, children who grow up in these kinds of terrible experiences and circumstances and families often don't want to talk about their background.  So I think this was a major factor for him.

. . . .

Q:     Okay.  And did [counsel] tell you to stand by, or did they have any discussions that you can remember as to whether they were going to be calling you or not calling you?

A:     They told me that he continued to be reluctant to allow any second phase testimony, that they were hopeful regarding the outcome of the trial and second phase testimony might not be necessary.  They weren't sure they were - - how they were gonna [sic] handle it, but they wanted to be certain that I would be available if they needed to call on me, and I indicated to them that I would be.

. . . .

Q:     Okay.  Okay.  Sir, were you ever made aware that Mr. Dessaure decide - - or signed a waiver of his opportunity to present mitigating evidence to the sentencing jury?

A:     At some point I was, yes.

. . . .

Q:     And you don't recall making - - there being a contemporaneous phone call that he called you up and said, hey, Mr. Dessaure signed a waiver today, or we're going to speak with him in the jail and he wants to waive?  Anything like that?

A:     No, absolutely not.

Q:     Okay.  Sir, let me show you what's been introduced in evidence previously as Defense Exhibit 1 and Defense Exhibit 2.  One is dated I think September 6th of 2001, and one is dated the 11th of September 2001.

       Before that - - during that time frame of the first document, September 6th, 2001, which I believe is the day that the verdict came in against Mr. Dessaure of guilty, were you ever consulted by the defense team concerning your opinions as to whether Mr. Dessaure was competent at that time to make that kind of a decision to waive presentation of his mitigating circumstances?

A:     No.

Q:     And as of September 11th, 2001, have you even seen this document before, Waiver of Argument for Life Sentence, where it says the defendant, Kenneth Dessaure, hereby waives argument by counsel in favor of a life sentence in this cause.  Further, comma, I join the State in seeking a death sentence?

       Were you ever informed that Mr. Dessaure was going to sign that sort of a document?

A:     No.

Q:     And in your years of working in the area of death penalty litigation, have you ever seen this type of a form where a defendant actually signed something saying he's joining the State in seeking his death sentence?

A:     No.

Q:     Had you been informed of this by defense counsel, would you have wanted to personally evaluate Mr. Dessaure at that point in time to see if, in fact, he was competent to make that decision to join in the State in seeking his own execution?

A:     I would have strongly recommended that such an evaluation take place.

Q:     Why would you have done so?

A:     Well, this was literally a life-and-death matter, and at the very least Mr. Dessaure had recently experienced the stress of a trial.  He had a background that was consistent with mental illness, as well as substance abuse, and had a

life pattern of behavior of taking risks and engaging in dangerous activity without reasonable regard for his well-being.

All of those things would suggest that he might have made such a decision as is reflected in this waiver foolishly, under duress, involuntarily, without fully knowing and voluntary consent.

Q:     And what you would have done at that point in time in terms of an evaluation, can you take us through how you would have evaluated his competency at that point?

A:     Yes.  I would have insisted that he speak to me directly, that he meet with me privately as well as meet with me and his defense attorneys.  I would have asked him to explain in his own words exactly what his present legal situation was.    I would have first consulted with his attorneys to ensure that I understood exactly what it was.

I would have asked him about what it was more particularly that he was waiving.  I would have reminded him that I spoke to him about some matters that might be related to this previously and that he was now apparently waiving the opportunity to present anything along the lines of some of the information that he had refused to discuss with me, his family history, personal background and so on.

And I would have asked him to speak at least somewhat about what information might, in fact, come forward if he didn't waive this, and I would have made a conclusion based on that kind of inquiry and been prepared to present it to whoever was appropriate.

Q:     Okay.  I'm assuming that back when you saw him in February and March of [20]01, that you didn't report back to any defense counsel that you felt he was incompetent at that time to proceed in his post-conviction case; is that right?

A:     That's correct.

Q:     And the fact that you didn't find him to be incompetent back in February and March when you evaluated him, is that a substitute for when he signs the waiver in September of [20]01, another evaluation on your part, given the gravity of the form that he signed?

A:     No.

(Dkt. #13, Ex. B8, pp. 101-05, 110-13, 118-23).

Dr. Maher testified on cross-examination:

Q:     Now, doctor, you described a hypothetical type of evaluation that you may
       have conducted should you have been asked to determine competency as to
       those particular behaviors [of signing the waivers]?

A:     Yes.

Q:     Are you aware that the court conducted pretty much the same evaluation you
       described on the record in this case, having all the mitigation proffered to it by
       Mr. Dessaure's attorneys, and then specifically questioning Mr. Dessaure as to
       whether he wished to have that presented in live testimony or whether he
       waived it?

A:     I was aware there was some discussion and inquiry by the court during these
       proceedings.  I have not been aware of the specifics, not as you've described.

(Dkt. #13, B8, pp. 127-28).

The trial judge inquired of Dr. Maher:

Q:     You may have testified to this.  In your meetings with him, did you have any
       discussions with him about his feelings about not resisting the State seeking
       the death penalty?

A:     No, not that I can recall.  I mean, I'm sure that at some point I raised some of
       those issues.  But as you've asked the question, did you have discussion with
       him about it, I cannot say that I recall any discussion.

Q:     Did you have any discussions with him in any fashion about the death penalty?

A:     I confirmed that he understood that he was definitely facing the death penalty
       and that if he was convicted there was a substantial likelihood that he would
       be sentenced to death.

Q:     What was his reaction to that?

A:     I'm innocent and I want my defense team to focus on that.

(Dkt. #13, Ex. B8, p. 130).

### 3.   <u>Assistant Public Defender Barry Cobb</u>

Attorney Cobb testified at the Rule 3.851 evidentiary hearing that he did not have

reason to question Petitioner's competency:

Q:    During this two-year period in which you associated with [Petitioner], did you or anybody in the Public Defender's Office feel that he was incompetent to assist counsel in defense of his case; and, along that same line, if you did, did you ever consider having - - making a motion before the court to have him examined for that purpose?

A:    I - - I cannot recall specifically thinking that he was not competent, but I can tell you we had him examined, and we were able to - - I'm trying to remember how the money was allocated back then, but I believe even then we were able to do that confidentially. . . .

. . . .

Q:    And why did you have that examination performed?

A:    Well, for a variety of reasons.  One, to get a diagnosis to see if he had an Axis I diagnosis, to see if there was anything wrong with him.  Part of that would have been competency.

I guess what I'm trying to say to you, Judge, is that although we surely would have had his competency examined as part of the mental health evaluation in total, I can't recall whether we ever did that just on that single issue.  "Doctor, just look at this issue," I don't recall that, but the fact that I don't recall it doesn't mean I can promise you it didn't happen.

My memory is that we were looking at his total mental health picture, where he's at, how he got there, and what would that mean in the context of mitigation.

Q:    Was there anything about the results of that examination that suggested to you that he was not competent to stand trial and assist counsel?

A:    Not that I can recall today.

Page 36 of  72

Q:   Okay.   Now, you've testified that you were fearful that he would become a volunteer [for the death penalty] is the term that you used.   I guess it's frequently used in defense work in capital cases.

If a defendant is otherwise, in your mind, competent, who expresses a strong and sincere desire to, after he's either pled guilty to first degree murder or been found guilty, to go ahead with the death penalty, is it your policy and/or the Public Defender's policy to resist that desire and continue to try and dissuade him from seeking the death penalty?

A:   That's my policy.

(Dkt. #13, Ex. B8, pp. 158-60).

## 4.   <u>Attorney Richard Watts</u>

Attorney Watts testified that he consulted with Dr. Maher and believed that Petitioner

was competent to waive his right to present mitigation:

Q:   Did you ever consult with Dr. Maher about Mr. Dessaure want[ing] to sign a piece of paper saying he wanted to waive all his rights to present mitigation?

A:   I'm not sure that we discussed the actual waiver, the mechanics of that, but I did discuss with Dr. Maher [whether] Kenny [was] capable of making this type of decision and I thought he was and but [sic] Dr. Maher confirmed that he thought so, too.

. . . .

Q:   And was that the only time you discussed the matter with Dr. Maher?

A:   Only once, yes, sir.   Here's - - as I recall it, I would let Dr. Maher know, by the way, Mr. Dessaure is still maintaining his position, still maintaining his position.

At some point, and it's gonna [sic] be near the time of the trial, do we need to do - - is he competent to make that decision came up in conversation and the answer was affirmative and that's where it remained.   I felt he was, and Dr. Maher felt he was.

Q:    Well, do you have - - you don't have - - you don't hold any mental health
      degrees.  You don't testify as an expert on competency issues?

A:    No, sir, but when competency comes up, when I'm concerned about
      competency, I have an obligation to bring it to the court's attention.  I never
      had that feeling about Mr. Dessaure.

(Dkt. #13, Ex. B8, pp. 196, 198-99).

**Analysis**

The federal standard for competence to stand trial is whether the defendant has

sufficient present ability to consult with his lawyer with a reasonable degree of rational

understanding and a rational as well as factual understanding of the proceedings against him.

*See Godinez v. Moran*, 509 U.S. 389, 396-97 (1993) (citing *Dusky v. United States,* 362 U.S.

402 (1960) (per curiam); *Drope v. Missouri,* 420 U.S. 162, 171 (1975)).  *See also Pate v.*

*Robinson*, 383 U.S. 375 (1966).  Similarly, as the Florida Supreme Court noted in its opinion

affirming the denial of Petitioner's state Rule 3.851 motion, Florida law requires a

competency evaluation only if the court or counsel "has [a] reasonable ground to believe that

the defendant is not mentally competent to proceed." *Dessaure v. State*, 55 So. 3d at 482

(citing Fla. R. Crim. P. 3.210(b)).  "Once a defendant is determined competent to stand trial,

a presumption of competence attaches to the defendant in later proceedings." *Boyd v. State*,

910 So. 2d 167, 187 (Fla. 2005) (citation omitted).

Counsel had Dr. Maher evaluate Petitioner's competency before trial and Dr. Maher

concluded that Petitioner was competent to both stand trial and participate in the penalty

phase proceedings.  Despite Petitioner's resistance, counsel fully prepared for the penalty

phase in anticipation of Petitioner electing to present mitigating evidence. Petitioner steadfastly maintained that he did not want counsel to present such evidence on his behalf. The trial judge thoroughly examined Petitioner several times and Petitioner repeatedly averred that he freely and knowingly chose to forego, against counsels' advice, both presentation of mitigating evidence and argument in favor of a life sentence. Nothing in the pre-trial evaluation, trial proceedings, or penalty proceedings raised a question about Petitioner's competency to enter the waivers as he now claims. *See Medina v. Singletary*, 59 F.3d 1095, 1106 (11th Cir. 1995).

In the context of an ineffective assistance of counsel claim in which a petitioner faults trial counsel for failing to investigate or act upon the petitioner's alleged incompetence, the petitioner must do more than raise a bare allegation of incompetence. Rather, he must allege facts suggesting either that counsel was aware of signs indicating petitioner's incompetence and unreasonably failed to act upon them, or that counsel unreasonably failed to investigate the petitioner's competence. *See Strickland v. Washington*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigation or to make a reasonable decision that makes particular investigation unnecessary . . . . [A] particular decision not to investigate must be directly assessed for reasonableness in all circumstances, applying a heavy measure of deference to counsel's judgments.").

In the instant case, under *Strickland,* Petitioner cannot establish either deficient performance or resulting prejudice based on counsels' decision not to pursue a second competency evaluation:

> The test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done. We ask only whether some reasonable lawyer at the trial could have acted, in the circumstances, as defense counsel acted at trial. . . . We are not interested in grading lawyers' performances; we are interested in whether the adversarial process at trial, in fact, worked adequately.

*White v. Singletary*, 972 F.2d 1218, 1220-21 (11th Cir. 1992). *Accord Chandler v. United States*, 218 F.3d 1305, 1313 (11th Cir. 2000) ("To state the obvious:  the trial lawyers, in every case, could have done something more or something different.  So, omissions are inevitable. . . . [T]he issue is not what is possible or 'what is prudent or appropriate, but only what is constitutionally compelled.'") (*en banc*) (quoting *Burger v. Kemp*, 483 U.S. 776, 794 (1987)).  Petitioner fails to establish that any reasonable ground existed to question his competence to enter the two waivers.  Consequently, he fails to demonstrate that counsels' performance fell outside the bounds of reasonable professional judgment.  The state court applied the appropriate test under *Strickland* to this claim of ineffective assistance and made a reasonable determination of the relevant facts bearing upon counsels' performance.  Petitioner fails to meet his burden of establishing that the Florida Supreme Court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in rejecting this ground.  *See* 28 U.S.C. § 2254(d)(1), (2).

**Ground Two**

Petitioner contends that his trial counsel rendered ineffective assistance during the penalty phase by failing to present mitigating evidence at the *Spencer*[15] hearing.  Petitioner

---

[15]  *See Spencer v. State*, 615 So. 2d 688 (Fla. 1993).

argues that Dr. Maher "was ready, willing, and able" to present testimony about Petitioner's alleged post-traumatic stress disorder.  However, counsel "[i]nexplicably . . . proffered to the court that Dr. Maher was prepared to offer evidence as to the statutory mitigator but then failed to present this evidence at the *Spencer* hearing."  (Dkt. #1, pp. 11-12).  Petitioner asserts that if counsel had presented evidence of the post-traumatic stress disorder by calling Dr. Maher to testify, "there is a reasonable probability that the outcome would have been different as a life sentence would have been imposed."  (Dkt. #1, p. 12).

The state post-conviction court rejected this ground[16] for relief in Petitioner's Rule 3.851 motion after an evidentiary hearing:

> The allegations as stated in this ground defeat Defendant's other claim that counsel was ineffective for failing to present evidence of the statutory mitigator "extreme mental or emotional disturbance."  In the motion itself he conceded that such evidence was presented to the court through the proffer of Dr. Maher's testimony.  During the *Spencer* hearing defendant could have presented the testimony of Dr. Maher to the court.  He did not call Dr. Maher to testify and he later signed a written waiver acknowledging the relinquishment of the right to present such testimony.  Counsel cannot be deemed ineffective when a proffer of the doctor's testimony was made and further evidence in mitigation was not presented in accordance with the instructions of defendant as is evidenced by his valid waiver.

(Dkt. #13, Ex. B3, pp. 23-24) (court's record citations omitted).

The Florida Supreme Court affirmed on appeal the state post-conviction court's denial of this claim of ineffective assistance:

> Dessaure next claims that his counsel was ineffective for not presenting the testimony of Dr. Maher at the *Spencer* hearing.  We disagree.

---

[16] *See* Rule 3.851 motion, ground 5.  (Dkt. #13, Ex. B1).

The law is well-established that a competent defendant may control decisions pertaining to his defense, including the presentation of mitigation evidence, and that counsel will not be rendered ineffective for following a competent defendant's wishes. *See Hamblen v. State,* 527 So. 2d 800, 804 (Fla. 1988) ("[I]n the final analysis, all competent defendants have a right to control their own destinies.").

Here, Dessaure repeatedly made it clear that he did not want to present mitigation to a penalty phase jury. Yet, despite Dessaure's insistence that he did not want a penalty phase and despite his lack of cooperation, Dessaure's defense counsel investigated all possible mitigation in preparation for the penalty phase. Defense counsel then proffered the mitigation to the trial court, including that Dr. Maher diagnosed Dessaure with post-traumatic stress disorder arising from childhood trauma within his family and that as a result of that disorder, at the time he committed the crime, he would have had difficulty conforming his behavior to the requirements of the law and would have been under extreme emotional disturbance.

After each proffer of mitigation testimony, the trial judge asked Dessaure if he understood that this testimony could be used to establish a mitigating factor for the court to consider, and also if he understood that by not allowing counsel to present any evidence to support this proffer, the court would not consider it in sentencing. To each question, Dessaure answered that he understood. Dessaure also reaffirmed his decision not to present any evidence to support the mitigation and not to present any legal argument against any aggravating circumstance. After each proffer of mitigation, Dessaure was asked whether he was continuing to exercise his right not to present evidence of mitigation and he insisted that he was.

Later, at his family's prompting, Dessaure decided that he did want to present some mitigation at his *Spencer* hearing. As a result, defense counsel presented the mitigation testimony of Mary Parent, the mother of Dessaure's child, and Louise Randal, Dessaure's grandmother. Dessaure also testified on his own behalf and asked the judge to impose a life sentence. Thereafter, defense counsel informed the court [at the October 26, 2001, sentencing hearing] that Dessaure waived his right to present any additional testimony or evidence, and the following exchange took place:

| | |
|---|---|
| Court: | What are you waiving now, Mr. Watts? |
| Defense Counsel: | Judge, further evidence. I have advised Mr. Dessaure that we've prepared a complete penalty phase and that we've proffered some and then we've presented some evidence. We could have asked this |

|           | Court for more time to present Dr. Mayer or anybody else on the witness list.  And that is the purpose of the waiver.[17] |
|-----------|---------------------------------------------------------------------------------------|
| Court:    | So, Mr. Dessaure, at this point you're waiving your right to present any additional testimony or evidence at this time; is that right? |
| Dessaure: | Yes, sir.                                                                             |

Then, Dessaure signed a written waiver stating that (1) he was aware that additional mitigating evidence existed and could be presented to the trial court as evidence; (2) he understood that the mitigation that was proffered was not evidence that could be weighed by the trial court; (3) his attorneys had advised him that they would be glad to call additional witnesses and present additional evidence and that the court would

---

[17]  The October 26, 2001, waiver states:

COMES NOW the Defendant, KENNETH LOUIS DESSAURE, and waives presentation of any additional mitigation and states:

1.     That I have been advised and I understand that there exists additional mitigating evidence which I could present to the Court as evidence to weigh in consideration of my sentence of capital life in prison or the death penalty.

2.     That I understand that the mitigating circumstances that were proffered to the Court, by way of representations of counsel, is not evidence to be considered by the trial court at sentencing.

3.     My lawyers have advised me that the Court would likely allow me to present this evidence, and that they would be glad to call in the witnesses that they listed, and the evidence that they proffered, at an additional future proceeding, so that the Court may consider all that mitigation in rendering its sentencing decision.

4.     Having been advised of the above, and understanding, I hereby waive presentation of additional mitigation and rely on the record as it stands, for the Court's consideration of my sentence.

UNDER PENALTY OF PERJURY, I declare the foregoing statements are true and correct.

(Dkt. #13, Ex. A24, pp. 4351-52).

likely allow the presentation of evidence; and (4) "[h]aving been advised of the above, and understanding, I hereby waive presentation of additional mitigation and rely on the record as it stands, for the Court's consideration of my sentence."

In sum, Dessaure's counsel was prepared and proffered all mitigation at a sentencing hearing, including the findings of Dr. Maher. When Dessaure changed his mind about presenting some mitigation at the *Spencer* hearing, defense counsel presented the testimony of Ms. Randal and Ms. Parent. Mr. Watts then informed the trial court that he could also present the testimony of Dr. Maher, but that Dessaure did not wish to present additional mitigation. And Dessaure signed a waiver acknowledging as much. Defense counsel cannot be ineffective for following Dessaure's direction under these circumstances. Accordingly, we affirm the trial court's denial of this claim.

*Dessaure v. State*, 55 So. 3d 478, 483-85 (Fla. 2010). The record supports the Florida

Supreme Court's rejection of this ground of ineffective assistance.

Counsel at the September 11, 2001, penalty phase proffered Dr. Maher's testimony:

Watts:      Dr. Maher is a psychiatrist from Tampa. He has testified probably before this Court in similar proceedings. He had been engaged by the Public Defender and then provided with the crime statistics from the Baskins area [where Petitioner grew up] and had read investigative reports giving the background of Mr. Dessaure. He had only visited with Kenny a little bit, a couple of hours in time, and Mr. Dessaure was not forthcoming as far as family history goes. Notwithstanding that, Dr. Maher was able to make a diagnosis of post-traumatic stress disorder arising from childhood trauma within the family and also from the living in virtually an urban war zone, crime zone right outside his front door, that as a result of that disorder, that Kenny would have had difficulty conforming his behavior to the requirements of the law at the time of the crime and also would have at the time of the crime been under the influence of extreme emotional disturbance. And Dr. Maher is extrapolating that if Kenny had committed the crime, then those would have be[en] operating in that fashion, those would have been statutory mitigators he would testify to. He did indicate that Mr. Dessaure never discussed the crime with him and denied committing the crime. He would also have commented on the age of the defendant and given the post-traumatic stress disorder that emotionally and intellectually and behaviorally he would have been immature as a 21 year old at the time of the crime. He indicated again a limited amount

of contact and a limited amount of cooperation, but he believes that hundreds of hours of time would have given him the same basic conclusion of the post-traumatic stress.  He is confident that that was found.  That's all for Dr. Maher.

Court:          I[t] would be the position of Dr. Maher that while the problems that he would testify to would not rise to the level of the statutory mitigator of being under extreme mental or emotional disturbance, but it would be sufficient for the non-statutory mitigator that there was some type of mental or emotional disturbance that the jury could consider?

Schwartzberg:          Judge, he would have found it to be extreme, not to rise to the level of insanity, but to rise to the level of the statutory mitigator that would be extreme.

Court:          I understand.  All right.  Again, Mr. Dessaure, you have heard what Mr. Watts has said concerning Dr. Maher's testimony.  Is that your understanding, if called, of what he would testify to?

Defendant:          Yes, sir.

Court:          And it is your position and desire that he not be called to testify; is that correct?

Defendant:          Yes.

(Dkt. #13, Ex. A38, pp. 1903-05).

After the penalty phase hearing, Petitioner decided to present at the *Spencer* hearing limited mitigation testimony from the mother of one of his children (Mary Parent) and his grandmother (Louise Randal).  (Dkt. #13, Ex. A24, transcript of October 15, 2001, *Spencer* hearing, pp. 4425-42).  Petitioner also testified on his own behalf and averred that he had changed his mind about joining the State in seeking a death sentence.[18]

---

[18]  Petitioner testified on direct examination at the *Spencer* hearing:

(continued...)

Petitioner at the October 26, 2001, sentencing hearing presented to the court the written waiver of presentation of additional mitigation and counsel advised the court that, although he could call Dr. Maher to testify on Petitioner's behalf, Petitioner chose not present

---

[18](...continued)

Q:    Kenny, you have filed a document in this particular case saying that you seek the State of Florida - - or you join the State of Florida in seeking the death penalty.  Has that changed?

A:    Yes, it has.

Q:    So at this point in time, you're asking the judge to impose a life sentence?

A:    Yes, I am.

Q:    Would you please tell Judge Downey what that is?

A:    For the simple fact that I was - - during the whole time I was being charged with this crime, I was pretty upset about it.  And when I did get found guilty of it, I just reacted on my own, I guess you can say, anger.  And I just wanted - - at that time I wanted it.  I was mad.

    And when I get mad, I tend to want to hurt myself.  So I was not paying attention to my family and my kids' needs.  I was more concerned - - and I was mad.  And I couldn't believe all of this was going on.  So I just wanted to get it over with.

(Dkt. #13, Ex. A24, transcript of October 15, 2001, *Spencer* hearing, pp. 4446-47).  Petitioner further testified on cross-examination:

Q:    You testified before this court that you no longer wished to be sentenced to death?

A:    No, I do not.

Q:    And you wish to retract that waiver?

A:    Yes, I do.

Q:    And you wish for your lawyers, I'm assuming then, to file the appropriate memorandums on your behalf?

A:    Yes. Sir.

(Dkt. #13, Ex. A24, transcript of October 15, 2001, *Spencer* hearing, p. 4454).

that testimony.  (Dkt. #13, Ex. A24, transcript of October 26, 2001, sentencing hearing, p. 4372).

### Testimony at the Rule 3.851 Evidentiary Hearing

Attorney Watts testified at the Rule 3.851 evidentiary hearing about the decision not to call Dr. Maher to testify at the *Spencer* hearing:

Q:    Now, at some point in time did Mr. Dessaure change his mind and allow some mitigation to be presented at the *Spencer* hearing?

A:    Yes, he did.

Q:    Do you know why Dr. Maher was not called at the *Spencer* hearing?

A:    And I don't have a recollection of why he wasn't called, but I can tell you that the best answer that I can give you to that is that we had something that Mr. Dessaure wanted to put on and that's what we put on.  He - - he was - - Mr. Dessaure was never enthusiastic about Dr. Maher and - -

Q:    Did he prevent you from putting Dr. Maher on at the *Spencer* hearing?

A:    I can't say that he did, but it was - - he had what - - he told me what he wanted to put on and that's what we put on.

Q:    Did you talk to him about, hey, we got an opportunity we can put Dr. Maher on and we can have the mental mitigation and the other witnesses also?

A:    Yes.  I would say unequivocally, yes, that we would - - that would have always been available to Mr. Dessaure.  If he ever wanted to put anything on, we would have done it and we would have made that available to him.

Q:    But as you sit here today, you can't tell us that he prevented you from putting Dr. Maher on at the *Spencer* hearing?

A:    I can you tell you that he did not prevent it.  When we went into that *Spencer* hearing, it was to present what Mr. Dessaure wanted to present.  It would have been presented to him that all your mitigation is still available.

Q:      It would have been presented.  What do you remember specifically as you sit here today, sir, that you discussed with Mr. Dessaure about Dr. Maher, calling him to testify in the *Spencer* hearing, if anything?

A:      That he's available, that we can put him on, that we could put any and all of your witnesses on.  What do you want to do?  I only want to put on a couple of witnesses, and for specific reasons, and that's what we did.

Q:      Did you ever contemplate asking the court to consider Dr. Maher's proffer as substantive evidence at that point?

A:      No, sir.

Q:      That would have required no additional testimony, correct?

A:      Correct.

Q:      And the court would have actually considered the mental mitigators in this case when the sentencing order came through?

A:      Correct.

Q:      Did you contemplate doing that?

A:      I can't recall exactly the details of that, but I can tell you that we were painstaking in telling Mr. Dessaure the difference between what we say, summarizing the evidence, and actually putting evidence on.  And he wanted to do the minimum, the very least that we felt like the law required.  So to answer that best I can is it would have been a joint and mutual decision.

Q:      So in this case you have a client that wants no mitigation presented.  Then he wants to join the State with his death sentence.  Then he gets to the *Spencer* hearing and want to put on some evidence.  That didn't put on a red flag that this guy's mind is not thinking too clearly about whether he should put mitigation in or not?

A:      Well, it seemed clear to me.  He articulated the reason why it made sense and that's what we did.

Q:      But he changed that.  He changed his mind.

A:     It was only a minor change and it was for a particular reason.

Q:     Did you notify Dr. Maher of that change - -

A:     No, sir.

Q:      - - in addition?

A:     I didn't.

Q:     And you were allowed to put a sentencing memorandum together in the case?[19]

A:     Yes.

Q:     Mr. Dessaure allowed that, right?

A:     Yes.

(Dkt. #13, Ex. B8, pp. 206-10).

Attorney Watts testified on cross-examination at the Rule 3.851 evidentiary hearing:

Q:     You mentioned at the time of the *Spencer* hearing that it would be your practice to tell him that anything mitigating available [sic] would be available to him?

A:     It's our last chance to bring anything and everything before the court.  It's all available to him.

Q:     And you testified that at the time of the *Spencer* hearing he chose to direct you as to what mitigation to present?

A:     Yes, sir.

Q:     You made reference to [sic] there was a reason for his decision to come forward with mitigation at that time?

A:     Yes.

_____

[19]  Defense counsel filed a Memorandum of Law In Support of A Life Sentence on Petitioner's behalf.  (Dkt. #13, Ex. A24, pp. 4337-41).

Q:      What was that reason?

A:      I would say his favorite - - Mary Parent was the lady that stood up for Kenny, was the mother of I think two of his children but, at any rate, she was the woman in his life at the time, and she had told him that she wanted him to go for a life sentence, at least go for it.  And the notion that she put forward was she would not write him or she would not be there for him and communicate with him while he's on death row unless he gives it a try.  And so she testified.  He testified.

Q:      So is it fair to say his motivation may not have been to actually mitigate but to maintain contact with Mary parent?

A:      That was how I understood it.

Q:      So he likewise - - or as a result at that point, he never requested anybody other than the people that did actually appear at the *Spencer* hearing?

A:      Yes.  It was to satisfy her.

Court:  Let me ask you this:  Did you have any conversations with him after the death penalty was imposed, before the *Spencer* hearing?

A:      Yes, sir.

Court:  With respect to the death penalty?

A:      Oh, yes, sir.  Yes, sir.

Court:  And before he changed his mind because of the lady, what was his attitude during that period?

A:      It remained unchanged throughout.  The only change occurred, and we were responding to that change, was to put her on, put on a perfunctory presentation at the Spencer hearing to the judge.  And Mr. Dessaure testified as well and I thought he did a wonderful job of testifying.

Court:  And what was the extent of his testimony?

A:      He told about his love for his children and how he cared about them and that they were the center of his life.

Court:      And that's why he wanted the court to consider - -

A:          Yes, sir.

Court:      - - life instead of death?

A:          That's correct.

Court:      But your testimony is he only testified to that reason as a way to satisfy the lady in his life so that she will communicate with him on death row?

A:          That's - - that was the motivation for going forth, for putting anything on.

. . . .

Q:          And, in fact, when the court ultimately issued a sentencing order, there was mitigation found on behalf of the defendant, was there not?

A:          I believe so.

Q:          The defendant's grandmother also testified at the *Spencer* hearing, did she not?

A:          Yes, sir.

Q:          And she testified as to his troubled childhood and his growing up in her home?

A:          Family background, yes, sir.

Q:          Okay.  Now, when it came to the initial sentencing phase where the waiver was entered, you and Mr. Schwartzberg and Mr. Flanagan indicated to the court that there would be a proffer of testimony that would have been available should Mr. Dessaure choose to put on mitigation?

A:          Yes.

Q:          And did both yourself and Mr. Flanagan go through a list of witnesses and their purported testimony on the record?

A:          We told the court the names of the witnesses and a summary of their testimony.

Page 51 of  72

Q:      And then it was after that summary in each and every one that the court
        inquired of Mr. Dessaure if he wanted to have that mitigation placed before the
        court?

A:      Yes.

Q:      And at any time from that date on has Mr. Dessaure ever contacted you and
        said, hey, I want to withdraw that written waiver I signed?

A:      No.

Q:      And did he ever tell you that before the *Spencer* hearing, look, you know, we
        let the jury go but I want to impanel the jury.  I want to put this mitigation on?

A:      No, sir.

(Dkt. #13, Ex. B8, pp. 221-25).

        Petitioner fails to rebut the state court's findings of fact by clear and convincing

evidence.  He has demonstrated neither that his October 26, 2001 Waiver of Presentation of

Additional Mitigation was not knowingly entered nor that counsel presented the waiver to

the state court without his consent.  Counsel at the September 11, 2001, penalty phase

hearing proffered Dr. Maher's testimony about Petitioner's post-traumatic stress disorder and

his opinion that Petitioner's traumatic childhood background rose to the level of an "extreme

statutory mitigator."  Upon inquiry by the trial judge, Petitioner averred that he understood

the substance of Dr. Maher's testimony but was unwilling to allow counsel to present that

testimony for the court's consideration in sentencing.  (Dkt. #13, Ex. A38, pp. 1903-05).

Despite Petitioner's subsequent decision to allow limited testimony at the *Spencer* hearing,

he persisted in his unwillingness to allow Dr. Maher's testimony.  The record shows that

Petitioner understood the sentencing implications of Dr. Maher's testimony.  Counsel, in not

presenting Dr. Maher's testimony at the *Spencer* hearing, followed Petitioner's instruction as memorialized in the October 26, 2001 Waiver of Presentation of Additional Mitigation.

The state court reasonably concluded that Petitioner waived presentation of Dr. Maher's testimony. Petitioner does not argue or even allege that counsel could have presented that testimony in light of his written waiver and asserts no challenge to the waiver's validity. He likewise does not challenge the state court's finding that he did not wish to present any mitigation evidence at the *Spencer* hearing aside from that of Mary Parent and Louise Randal. Petitioner does not claim that he wanted Dr. Maher to testify at the *Spencer* hearing. Petitioner's present willingness to offer Dr. Maher's testimony does nothing to undermine his decision, at the time of trial and sentencing, to forego that testimony. *See Allen v. Sec'y, Dep't of Corr.*, 611 F.3d 740, 763 (11th Cir. 2010) ("Allen's willingness to present mitigation evidence *today*, however does nothing to alter his steadfast desire *at the time of his trial* to seek the death penalty instead of life in prison.") (emphasis in original). *See Schriro v. Landrigan*, 550 U.S. 465 (2007) ("[I]t was not objectively unreasonable for th[e] [state post-conviction court] to conclude that a defendant who refused to allow presentation of any mitigating evidence could not establish *Strickland* prejudice based on his counsel's failure to investigate further possible mitigating evidence.").

Even assuming, *arguendo*, that trial counsel performed deficiently by either failing to call Dr. Maher to testify at the *Spencer* or failing to proffer Dr. Maher's testimony at the hearing, Petitioner fails to demonstrate that absent counsel's alleged error, a reasonable probability exists that he would have received a life sentence rather than the death penalty.

*See Strickland v. Washington*, 466 U.S. at 695 (The prejudice inquiry "is whether there is a reasonable probability that, absent the errors, the sentencer . . . would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.").

Because Petitioner fails to show that the state court's rejection of this ineffective assistance claim resulted in an unreasonable application of *Strickland* or an unreasonable determination of the facts, ground two warrants no federal habeas relief. *See* 28 U.S.C. § 2254(d)(1), (2).

## II.    INEFFECTIVE ASSISTANCE OF APPELLATE COUNSEL

### Standard of Review

*Strickland* governs an ineffective assistance of appellate counsel claim. *Heath v. Jones*, 941 F.2d 1126, 1130 (11th Cir. 1991), *cert. denied*, 502 U.S. 1077 (1992). To show entitlement to relief, Petitioner must demonstrate that appellate counsel performed deficiently and that the deficient performance resulted in prejudice. To demonstrate deficient performance, Petitioner must show that appellate counsel failed to discover a non-frivolous issue and failed to file a merits brief raising that issue. *Smith v. Robbins*, 528 U.S. 259, 285 (2000). To demonstrate prejudice, Petitioner must show that a reasonable probability exists that, but for appellate counsel's unreasonable failure to file a merits brief, Petitioner would have prevailed on appeal. *Smith v. Robbins*, 528 U.S. at 285-86; *Heath v. Jones*, 941 F.2d at 1132. Appellate counsel is not ineffective for failing to raise a claim "reasonably to be considered without merit." *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir.), *cert. denied*, 469 U.S. 956 (1984).

**Ground Three**

Petitioner contends that his appellate counsel rendered ineffective assistance by failing to challenge on direct appeal the jury instruction on first-degree felony murder when Petitioner was actually charged in the indictment with first-degree premeditated murder. Petitioner argues that the state trial court's allowing the prosecution to argue the theory of felony murder and instructing the jury on felony murder resulted in "an unconstitutional constructive amendment of the indictment." (Dkt. #1, P. 17). Petitioner further argues that "there was insufficient evidence to support a conviction for sexual battery, the underlying offense for the alleged burglary/felony murder," and that the state trial court's instruction to the jury on sexual battery constituted fundamental error. (Dkt. #1, p. 19). Petitioner claims that appellate counsel rendered ineffective assistance by failing to raise this fundamental error on appeal.

The Florida Supreme Court rejected this ground for relief in Petitioner's state petition for the writ of habeas corpus:

> Dessaure also filed a petition for habeas corpus claiming that his appellate counsel was ineffective for[:] (1) failing to raise on direct appeal that the jury instructions constituted fundamental error by improperly instructing the jury on felony murder and other charges not contained in the grand jury indictment; and (2) failing to raise instances of prosecutorial misconduct.

> "[W]hen evaluating a claim for ineffective assistance of appellate counsel, this Court must determine: (1) whether the alleged omissions are of such magnitude as to constitute a serious error or substantial deficiency falling measurably outside the range of professionally acceptable performance, and (2) whether the deficiency in performance compromised the appellate process to such a degree as to undermine confidence in the correctness of the result." *Lowe v. State,* 2 So. 3d 21, 42 (Fla. 2008) (citing *Pope v. Wainwright,* 496 So. 2d 798, 800 (Fla. 1986)). Because Dessaure has

not shown that his appellate counsel was ineffective according to these standards, we hold that he is not entitled to habeas relief.

A. *Challenging the Jury Instructions on Direct Appeal*

Dessaure first claims that his appellate counsel was ineffective for not challenging the jury instruction on first-degree felony murder when the indictment charged first-degree premeditated murder. However, this Court has long held that this type of instruction is proper. *See Williams v. State,* 967 So. 2d 735 (Fla. 2007). In *Williams,* this Court explained:

> "It is well established that an indictment which charges premeditated murder permits the State to prosecute under both the premeditated and felony murder theories." *Parker v. State,* 904 So. 2d 370, 382-83 (Fla. 2005). We have further held that "[t]he State need not charge felony murder in an indictment in order to prosecute a defendant under alternative theories of premeditated and felony murder when the indictment charges premeditated murder." *Kearse v. State,* 662 So. 2d 677, 682 (Fla. 1995). Similarly, this Court has "repeatedly rejected claims that it is error for a trial court to allow the State to pursue a felony murder theory when the indictment gave no notice of the theory." *Gudinas* [*v. State* ], 693 So. 2d [953, 964 (Fla. 1997)].

*Williams,* 967 So. 2d at 758-59. "Appellate counsel cannot be deemed ineffective for failing to raise a claim which 'would in all probability' have been without merit or would have been procedurally barred on direct appeal." *Mansfield v. State,* 911 So. 2d 1160, 1178 (Fla. 2005) (quoting *Williamson v. Dugger,* 651 So. 2d 84, 86 (Fla. 1994)). Consequently, appellate counsel cannot be considered ineffective here.

Dessaure also asserts that appellate counsel was ineffective for failing to assert that the trial court erred by instructing the jury on sexual battery when it was not charged in the indictment and when there was insufficient evidence to support it. But this Court has also rejected the claim that the indictment must provide notice of the underlying felonies used to prove felony murder. *See id.* at 1178-79. "Because the State has no obligation to charge felony murder in the indictment, it similarly has no obligation to give notice of the underlying felonies that it will rely upon to prove felony murder." *Id.* at 1179 (quoting *Kearse v. State,* 662 So. 2d 677, 682 (Fla. 1995)). And despite Dessaure's assertion to the contrary, there was ample evidence here to support that a sexual battery occurred - the victim was found naked and face

down on the floor; Dessaure's semen was found on a towel near the victim's body and on her bed linens; and a witness testified that Dessaure told him he struck the victim and began having sex with her.  Therefore, this claim is meritless, and counsel cannot be ineffective for not raising it on appeal.

*Dessaure v. State*, 55 So. 3d 478, 485-86 (Fla. 2010).

As Respondent correctly notes, Petitioner's trial counsel raised no objection at trial to the jury instructions.  (Dkt. #13, Ex. A36, pp. 1663-82; Ex. A37, pp. 1783-1807).  To raise an argument on appeal, the argument must first be presented to the trial court, "and the specific legal argument or ground to be argued on appeal must be part of the presentation." *Archer v. State*, 613 So. 2d 446, 448 (Fla. 1993).  Failure to preserve the argument by objection precludes presentation of the argument on direct appeal.  *See Henderson v. Kibbe*, 431 U.S. 145, 154 (1977) ("It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court."); *Diaz v. Sec'y, Dep't of Corr.*, 402 F.3d 1136, 1142 (11th Cir. 2005) ("Under Florida law, an error that passed without objection cannot be raised on appeal; appellate counsel, therefore, is not ineffective for failure to raise a meritless argument.").  *See also Medina v. Dugger*, 586 So. 2d 317, 318 (Fla. 1991) (finding no ineffective assistance of appellate counsel for failure to raise an issue not preserved for appeal).  An exception exists if appellate counsel fails to raise a claim, although not preserved for appeal, that presents a fundamental error.  *See Griffis v. State*, 848 So. 2d 422, 427 (Fla. 1st DCA 2003) ("Jury instructions are subject to the contemporaneous objection rule and absent such an objection at the trial, errors in instructions cannot be raised on appeal unless fundamental error occurred."); *Parker v. Sec'y,*

*Dep't of Corr.* 331 F.3d 764, 772-73 (11th Cir. 2003) (stating that Florida law provides that a jury instruction can be challenged on appeal even absent a contemporaneous objection at trial if the error was fundamental error). A fundamental error "reach[es] down into the validity of the trial itself to the extent that a verdict of guilty could not have been obtained without the assistance of the alleged error." *Spencer v. State*, 842 So. 2d 52, 74 (Fla. 2003) (citations omitted).

Appellate counsel's failure to raise the jury instruction issue on appeal was not constitutionally deficient because the issue was not properly preserved by objection in the trial court. Petitioner likewise cannot establish prejudice as a result of counsel's omission because no reasonable probability exists that had appellate counsel raised the jury instruction issue, the result of the appeal would have been different. Petitioner fails to demonstrate fundamental error because he fails to show that trial counsels' failure to object to the challenged jury instructions affected the validity of the trial itself to the extent that the guilty verdict could not have been obtained absent this failure to object. *See Spencer v. State*, 842 So. 2d at 74.

Alternatively, even if trial counsel had objected to the instructions and preserved the argument for appellate review, Petitioner would not have prevailed. The indictment charged Petitioner with premeditated first-degree murder by stabbing. (Dkt. #13, Ex. A1, p. 1). The indictment did not charge Petitioner with felony murder or any other enumerated offense. The prosecution proceeded at trial under both the premeditated and felony murder theories.

The trial judge instructed the jury on both first-degree premeditated murder and first-degree felony murder.[20] (Dkt. #13, Ex. A37, pp. 1783-87).

Contrary to Petitioner's contention, when an indictment charges premeditated murder, Florida law permits instructing the jury on both premeditated murder and felony murder. *See Anderson v. State*, 841 So. 2d 390, 404 (Fla. 2003) (rejecting defendant's argument that the trial court erred in permitting the State to proceed on a theory of felony murder when the indictment charged only first-degree murder); *Kearse v. State*, 662 So. 2d 677, 682 (Fla. 1995) ("The State need not charge felony murder in an indictment in order to prosecute a defendant under alternative theories of premeditated and felony murder when the indictment charges premeditated murder.") (citations omitted). The Eleventh Circuit has recognized this aspect of Florida law:

> At the time of Petitioner's trial, Florida law permitted (and still does) the [S]tate to prosecute under premeditated or felony murder theories when the indictment charged premeditated murder. . . . The [S]tate prosecuted primarily under a premeditated design theory even though evidence showing felony murder was introduced at trial. The trial court simply refused to limit the [S]tate to one theory of prosecution where state law permitted the prosecution to proceed under a dual theory. If there was error by the trial court, this Court is convinced that such error was not of a constitutional dimension. The benefit to the [S]tate from the error (if any was committed) did not contribute to Petitioner's conviction since there was ample evidence upon which to base a conviction under either theory.

*Knight v. Dugger*, 863 F. 2d 705, 725 (11th Cir. 1988).

---

[20] The trial judge also instructed the jury on second-degree murder, third-degree felony murder, manslaughter, burglary, sexual battery, attempted sexual battery, aggravated battery, aggravated assault, battery, and assault. (Dkt. #13, Ex. A37, pp. 1788-98).

Contrary to Petitioner's contention, instructing the jury on both premeditated and felony murder did not equate to a constructive amendment of the indictment and appellate counsel cannot be deemed ineffective for failing to raise this non-meritorious argument. *See Chandler v. Moore*, 240 F.3d 907, 917 (11th Cir. 2001) ("[A]ppellate counsel was not ineffective for failing to raise a non-meritorious issue."); *United States v. Nyhuis*, 211 F.3d 1340, 1344 (11th Cir. 2000) ("Appellate counsel is not ineffective for failing to raise claims 'reasonably considered to be without merit.'") (citing *Alvord v. Wainwright*, 725 F.2d 1282, 1291 (11th Cir. 1984)).   Petitioner cannot demonstrate that the Florida Supreme Court's rejection of this claim of ineffective assistance of appellate was either contrary to, or an unreasonable application of, federal law. *See* 28 U.S.C. § 2254(d)(1).

## Ground Four

Petitioner contends that his appellate counsel rendered ineffective assistance by failing to challenge on appeal the prosecutor's presentation of false testimony and the prosecutor's improper closing argument.

<u>False testimony</u>

Petitioner contends that "[a]dditional evidence of prosecutorial misconduct involved the knowing presentation of false testimony by two jailhouse snitches [Valdez Hardy and Shavar Sampson],[21] both of whom testified in direct contradiction to the known physical

---

[21]  Both Hardy and Sampson were housed with Petitioner in the Pinellas County Jail before trial. (Dkt. #13, Ex. A28, pp. 622, 625; Ex. A35, pp. 1442-45).

evidence in the case."  (Dkt; #1, p. 21).  Petitioner claims that this alleged prosecutorial

misconduct violated *Giglio v. United States*, 405 U.S. 150 (1972).

The Florida Supreme Court rejected this ground for relief in Petitioner's state petition

for the writ of habeas corpus:

> Dessaure also argues that his appellate counsel was ineffective for failing to raise on
> direct appeal that the prosecution knowingly presented the false testimony of two
> jailhouse informants who testified about statements Dessaure made to them.  This
> claim is meritless because Dessaure has not proven that the informants' testimony was
> false or that the prosecution knew the testimony was false.  *See Giglio v. United
> States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972).

*Dessaure v. State*, 55 So. 3d at 87.

"To make out a valid *Giglio* claim, a petitioner 'must establish that (1) the prosecutor

knowingly used perjured testimony or failed to correct what he subsequently learned was

false testimony; and (2) such use was material - i.e., that there is a reasonable likelihood that

the false testimony could have affected the judgment.'" *Ferguson v. Sec'y, Dep't of Corr.*, 580

F.3d 1183, 1208 (11th Cir. 2009) (quoting *Davis v. Terry*, 465 F.3d 1249, 1253 (11th Cir.

2006)).

A.     <u>Valdez Hardy</u>

Petitioner contends that, contrary to Hardy's testimony that Petitioner had blood on

his underwear,[22] no blood was ever found on Petitioner's underwear.  Petitioner also

---

[22] Hardy testified on direct examination that Petitioner told him that detectives had "seen blood
or something on [Petitioner's] underwear."  (Dkt. #13, Ex. A28, p. 633).

challenges Hardy's testimony that Petitioner told him that he went "upstairs" when, in fact,

"there was no upstairs to [Petitioner's] apartment."[23]

───────────────

[23]  Both Petitioner's and the victim's apartments were one-story dwellings.  Hardy testified on direct examination:

Q:      . . . . Let's just stick to what he told you about the incident.

A:      Okay.  Well, he came in - - he said he came home that morning and when he came home that morning he observed the young lady sitting in the lawn chair.  He said she was sitting in the lawn chair and he passed her.  So he said when he passed her, she had on a bathing suit.  She was sunbathing and she [was] looking good.  He said he went upstairs.  He said to hisself [sic] that he was going to try to be with her.  So he said he went

          upstairs.  He came back down and he took out the trash.  He said when he took out the trash he passed by and he winked at her.  So he said he throwed [sic] the trash away, walked back by.  Then he went back upstairs.  And at some point in time, I don't remember his exact words, but he came back down. . . .

(Dkt. #13, Ex. A28, pp. 630-31).  Counsel on cross-examination specifically questioned Hardy about his account of Petitioner's statement:

Q:      Now, as I understand your testimony here today, Kenny Dessaure told you that he went upstairs in his apartment on two occasions, came down, and saw this woman; correct?

A:      He said that he [had] seen her when he first came home.

Q:      Okay.  And then he went upstairs?

A:      Exactly.

Q:      And got his trash?

A:      Right.

Q:      Came downstairs?

A:      Took his trash back upstairs, came back downstairs.

Q:      Okay.  And then he took the trash out and he went back upstairs?

A:      I said he came home, he went upstairs.  When he came back downstairs, he took the trash out.  He went back upstairs.

                                                                                                (continued...)

Page 62 of  72

Petitioner fails to establish that the prosecutor committed a *Giglio* violation because he fails to establish that Hardy's testimony was false.[24]  Hardy testified about Petitioner's statements to him at the jail.  Petitioner presents no evidence, and does not allege, that Hardy lied about the content of their conversation.[25]  If Hardy's testimony differed from other facts, cross-examination was the appropriate avenue to undermine his credibility.

Petitioner's failure to establish that the prosecutor knowingly used perjured or false testimony precludes finding a *Giglio* violation.  *Ferguson v. Sec'y, Dep't of Corr.*, 580 F.3d at 1208.  Consequently, because Petitioner cannot establish such violation, he cannot establish that appellate counsel performed deficiently by failing to raise this issue on direct appeal.  Petitioner fails to meet his burden of proving that the Florida Supreme Court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in rejecting this claim of ineffective assistance of appellate counsel.

---

[23](...continued)

Q:      And then he came back down?

A:      And then when he came down?

Q:      She was gone.

A:      Are you certain that that's what Mr. Dessaure told you?

A:      That's exactly what he told me.

(Dkt. #13, Ex. A28, p. 659).

[24]  Petitioner's trial counsel objected to neither Hardy's nor Sampson's testimony at trial.

[25]  Sampson also testified that Petitioner told him that he had the victim's blood on his underwear. (Dkt. #13, Ex. A35, pp. 1449, 1462).  Petitioner does not challenge this portion of Sampson's testimony. Consequently, even despite Hardy's testimony, the jury was still apprised about the blood on Petitioner's underwear through Sampson.

B.    <u>Shavar Sampson</u>

Sampson testified at trial that Petitioner told him that he had sex with the victim and that he ejaculated inside of her.  This testimony, Petitioner contends, contradicts the medical examiner's testimony that no sperm or body fluids were found on the vaginal, anal, and oral swabs taken from the victim.  Sampson also testified that Petitioner told him that the victim was menstruating when Petitioner had sex with her.  This testimony contradicted the medical examiner's testimony that the victim was not menstruating.  Petitioner argues that "the prosecutorial misconduct in this case was designed to give some evidence of sexual contact between [Petitioner] and the victim in order to use sexual battery as the underlying felony for a felony murder conviction."  (Dkt. #1, p. 22).

Sampson testified on direct examination that Petitioner told him that he encountered the victim inside her apartment hoping to have a conversation with her.  Petitioner stated that the victim was not receptive and punched Petitioner who punched her back, rendering her unconscious.  (Dkt. #13, Ex. A35, pp. 1447-48).  While the victim was unconscious, Petitioner removed the victim's swimsuit and began having sex with her.  Sampson testified that Petitioner told him that "his sperm went into her . . . when he was having sex with her" which resulted in the victim beginning her menstrual cycle that "got all on his underwear." (Dkt. #13, Ex. A35, pp. 1449, 1462).

The medical examiner, Dr. Laura Hair, testified that she took oral, anal, and vaginal swabbings from the victim during the victim's autopsy.  (Dkt. #13, Ex. A35, pp. 1475-76). Dr. Hair testified on cross-examination that she discovered no blood in the victim's vaginal

area that would have indicated that the victim had begun her menstrual cycle and discovered

no evidence of sexual contact.[26]

---

[26] Dr. Hair testified on cross-examination:

Q:      Now, I'm going to assume that as lengthy as it was for you to describe 53 wounds to this jury, that's as much detail and time that you took in performing your autopsy so that you don't miss anything that would have been located on Ms. Riedweg's body; correct?

A:      Yeah.  I think it took me a lot longer than that to do the autopsy.

Q:      I appreciate that, Doctor.  And one thing that I did not hear you talk about is I didn't hear you tell this jury that there was any blood located in her vaginal area which would have indicated that she had started her menstrual cycle; correct?

A:      That's correct.

Q:      And if, in fact, that was something that you would have found during the course of your autopsy, that would have been a significant finding and you, of course, would have relayed it, put it in your report, and testified to it; correct?

A:      Yes.

Q:      And one other thing that I didn't hear you testify to this jury about was that there was no evidence of sexual contact with Ms. Riedweg and anybody else; correct?

A:      The rape kit that I submitted to the forensic technician came back as negative.

Q:      And you didn't find any areas that would have been consistent with semen or sperm or any sticky areas that were about her body that you would have detailed that were not contained in the rape kit or anything along those lines, correct, Dr. Hair?

A:      That's correct.

Q:      And I'm assuming that part and parcel of your examination was looking into her oral cavity, her mouth, to make certain that there was no indication of any sperm or anything along those lines located within her mouth also; correct?

A:      We take oral, vaginal, and anal swabs.

(Dkt. #13, Ex. A35, pp. 1539-40).

Petitioner is correct that Sampson's testimony and Dr. Hair's testimony are contradictory.  However, Petitioner fails to establish that Sampson's testimony was false.  Again, Petitioner's failure to establish that the prosecutor knowingly used perjured or false testimony precludes finding a *Giglio* violation with respect to Sampson.  *Ferguson v. Sec'y, Dep't of Corr.*, 580 F.3d at 1208.  Consequently, Petitioner cannot establish that appellate counsel performed deficiently by failing to raise this non-meritorious issue on direct appeal and fails to meet his burden of proving that the Florida Supreme Court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in rejecting this claim of ineffective assistance of appellate counsel.

Closing argument

Petitioner argues that the prosecutor improperly attacked the presumption of innocence by stating in closing argument:

> And when we started this trial he had a presumption of innocence and he only enjoyed that presumption at the start of the trial.  Once the first witness was called, once the evidence began to be presented, the State chipped and chipped away at that cloak, that shield he can hide behind.  And as you sit here . . . he no longer enjoys that presumption because we have proven our case.

(Dkt. #1, p. 21).  The Florida Supreme Court rejected this ground for relief in Petitioner's state petition for the writ of habeas corpus:

> Dessaure . . . argues that appellate counsel should have argued that the prosecutor's arguments during closing were improper. He specifically objects to the last comments made after the prosecutor led the jury through all the evidence in the case:
>
> > And when we started this trial he had a presumption of innocence and he only enjoyed that presumption at the start of the trial.  Once the first witness was called, once the evidence

> began to be presented, the State chipped and chipped away at
> that cloak, that shield he can hide behind. And as you sit here
> now, he no longer enjoys that presumption because we have
> proven our case.

We reject this claim for two reasons. First, this claim was not preserved by trial counsel with an objection, and, in the absence of fundamental error, "appellate counsel cannot be ineffective for failing to raise claims which were not preserved due to trial counsel's failure to object." *Brown v. State,* 846 So. 2d 1114, 1127 (Fla. 2003) (quoting *Johnson v. Singletary,* 695 So. 2d 263, 266 (Fla. 1996)); *see also Rodriguez v. State,* 919 So. 2d 1252, 1281-82 (Fla. 2005) ("Appellate counsel is not ineffective for failing to raise issues not preserved for appeal. However, an exception is made where appellate counsel fails to raise a claim which, although not preserved at trial, represents fundamental error." (citations omitted)). Second, this claim is meritless.

In *Easterly v. State,* 22 So. 3d 807 (Fla. 1st DCA 2009), the First District Court of Appeal distinguished a prosecutor's comment which states his opinion or belief that the evidence is strong from a prosecutor's comment which projects a statement of the law. In *Easterly,* the prosecutor stated during closing:

> The testimonial evidence in this case, the physical evidence in
> this case, has not only removed the presumption of innocence
> from this man, it has torn it away and shown him for what he did
> to [K.D.] on [sic] May of 2004 when he raped her.

22 So. 3d at 816. The First District held that the comment did not constitute fundamental error because it "was tied directly to the prosecutor's perspective on the strength of the evidence." *Id.* at 817; *see also Dailey v. State,* 965 So. 2d 38, 44 (Fla. 2007) ("Regarding the prosecutor's statements concerning Dailey's presumption of innocence, we agree with the trial court that when read in context, the comments appear to be a statement by the prosecutor of her belief that the State satisfied its burden of proof. Therefore, counsel's failure to object was not deficient.").

Likewise here, the prosecutor's comments do not constitute error because the comments were directly tied to the prosecutor's perspective on the strength of the evidence. Specifically, after the prosecutor reviewed all of the evidence presented in the case, she stated that, although Dessaure enjoyed the presumption of innocence at the beginning of the trial, "the State chipped and chipped away at that cloak [and] he no longer enjoys that presumption because we have proven our case." These comments clearly reflect the prosecutor's opinion of the evidence and are not projecting a statement of the law. Accordingly, this issue is without merit. And

appellate counsel cannot be rendered ineffective for not raising an unpreserved and otherwise meritless claim on appeal.

*Dessaure v. State*, 55 So. 3d 478, 486-87 (Fla. 2010).

Petitioner's argument that the prosecutor improperly attacked the presumption of innocence in closing argument lacks merit. As a threshold matter, trial counsel failed to object to the prosecutor's closing argument at trial. Florida procedural rules require a defendant to both timely object and request a mistrial to preserve a claim for appeal based on improper argument. *Cole v. State*, 866 So. 2d 761, 763 (Fla. 1st DCA 2004) (citing *Nixon v. State*, 572 So. 2d 1336, 1340 (Fla. 1990)). "As a general rule, the failure to raise a contemporaneous objection when improper closing argument comments are made waives any claim concerning such comments for appellate review." *Card v. State*, 803 So. 2d 613, 622 (Fla. 2001). Appellate counsel's failure to challenge on appeal this particular comment from the prosecutor's closing argument was not constitutionally deficient because the issue was not properly preserved by objection in the trial court. Petitioner cannot establish prejudice as a result of counsel's omission because no reasonable probability exists that had appellate counsel raised the issue, Petitioner would have prevailed on appeal. *See Chandler v. Moore*, 240 F.3d at 917; *United States v. Nyhuis*, 211 F.3d at 1344. Petitioner fails to demonstrate fundamental error because he fails to show that trial counsels' failure to object to the challenged comment affected the validity of the trial itself such that the guilty verdict could not have been obtained absent this specific comment in closing argument.

Even considered on the merits, Petitioner's claim warrants no federal habeas relief. To prove a prosecutorial misconduct claim, Petitioner must show that the challenged conduct was both improper and prejudiced his substantial rights. *Sexton v. Howard*, 55 F.3d 1557, 1559 (11th Cir. 1995). An improper prosecutorial remark compels habeas corpus relief only if the remark is so egregious that the proceeding is rendered fundamentally unfair. "[I]t is not enough that the prosecutors' remarks were undesirable or even universally condemned." *Darden v. Wainwright*, 477 U.S. 168, 181 (1986). *See also Smith v. Phillips*, 455 U.S. 209, 219 (1982) ("[T]he touchstone of due process analysis in cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the prosecutor."). *Darden*, 477 U.S. at 181, teaches:

> The relevant question is whether the prosecutors' comments "so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Donnelly v. DeChristoforo*, 416 U.S. 637, [643] . . . (1974). Moreover, the appropriate standard of review in a petition for the writ of habeas corpus is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.*, at 642 . . . .

*Accord Tucker v. Kemp*, 802 F.2d 1293, 1296 (11th Cir. 1986) (*en banc*) ("If a reviewing court is confident that, absent the improper remarks, the jury's decision would have been no different, the proceeding cannot be said to have been fundamentally unfair."), *cert. denied*, 480 U.S. 911 (1987). A reviewing court must evaluate an allegedly improper comment in the context of both the prosecutor's entire closing argument and the trial as a whole because "[c]laims of prosecutorial misconduct are fact-specific inquiries which must be conducted against the backdrop of the entire record." *United States v. Hall*, 47 F.3d 1091, 1098 (11th

Cir. 1995).  *Accord United States v. Young*, 470 U.S. 1, 11 (1985) ("[A] criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone, for the statements or conduct must be viewed in context; only by doing so can it be determined whether the prosecutor's conduct affected the fairness of the trial.").

Closing argument is designed to "assist the jury in analyzing, evaluating and applying the evidence."  *United States v. Pearson*, 746 F.2d 787, 796 (11th Cir.1984).  While a prosecutor may not go beyond the evidence presented to the jury, the prosecutor is not limited to a bare recitation of the facts; he may comment on the evidence and express the conclusions he contends the jury should draw from the evidence.  *United States v. Johns,* 734 F.2d 657, 663 (11th Cir. 1984).  In Florida, while "wide latitude is permitted in arguing to a jury," *Breedlove v. State*, 413 So.2d 1, 8 (Fla. 1982), such latitude does not extend to permitting improper argument.  *Gore v. State*, 719 So.2d 1197, 1200 (Fla. 1998).

The trial judge instructed the jury that the attorneys' closing arguments were not evidence.  (Dkt. #13, Ex. A36, p. 1688).  A jury is presumed to follow a court's instructions.  *Weeks v. Angelone*, 528 U.S. 225, 234 (2000); *Brown v. Jones*, 255 F.3d 1273, 1280 (11th Cir. 2001).  Even assuming that counsel performed deficiently by not objecting or moving for a mistrial based on any of the comments, Petitioner demonstrates neither that an objection would have altered the outcome of the trial nor that counsel would have succeeded on a motion for mistrial based on the challenged statement.  *See Duest v. State*, 462 So.2d 446, 448 (Fla. 1985).  Taken in the context of the entire trial, the prosecutor's comment, even if improper, neither rendered the entire trial fundamentally unfair nor infected the trial with

such unfairness that the resulting conviction amounts to a denial of due process.  *See Tucker v. Kemp*, 802 F.2d at 1296.  Consequently, Petitioner's failure to establish fundamental error precludes him from establishing this ineffective assistance of appellate counsel claim. Petitioner fails to meet his burden of proving that the Florida Supreme Court unreasonably applied controlling Supreme Court precedent or unreasonably determined the facts in rejecting this claim.  *See* 28 U.S.C. § 2254(d).

### Evidentiary hearing

This case warrants no evidentiary hearing because "it plainly appears from the face of the motion and any annexed exhibits and the prior proceedings in the case that the movant is not entitled to relief."  *Broadwater v. United States*, 292 F.3d 1302, 1303 (11th Cir. 2003).

## CERTIFICATE OF APPEALABILITY AND LEAVE TO APPEAL IN FORMA PAUPERIS DENIED

IT IS FURTHER ORDERED that Petitioner is not entitled to a certificate of appealability. A prisoner seeking a motion to vacate has no absolute entitlement to appeal a district court's denial of his motion. 28 U.S.C. § 2253(c)(1).  Rather, a district court must first issue a certificate of appealability (COA).  *Id*.  "A [COA] may issue . . . only if the applicant has made a substantial showing of the denial of a constitutional right."  *Id*. at § 2253(c)(2).  To make such a showing, Petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong," *Tennard v. Dretke*, 542 U.S. 274, 282 (2004) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)), or that "the issues presented were 'adequate to deserve encouragement to proceed

further.'"  *Miller-El v. Cockrell*, 537 U.S. 322, 335-36 (2003) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 n. 4 (1983)).  Petitioner has not made the requisite showing in these circumstances.  Finally, because Petitioner is not entitled to a certificate of appealability, he is not entitled to appeal in forma pauperis.

It is therefore ORDERED AND ADJUDGED that:

1.     Petitioner's petition for the writ of habeas corpus (Dkt. #1) is DENIED.

2.     The Clerk is to enter judgment for Respondent and close this case.

**DONE** and **ORDERED** in Tampa, Florida on December 13, 2011.

JAMES S. MOODY, JR.
UNITED STATES DISTRICT JUDGE

Copies furnished to:
Counsel/Parties of Record

JSM:kw

F:\Docs\2011\11-cv-500.deny 2254.wpd